John R. MAPOTHER, Stephen E. Nevas, et al.,

v.

DEPARTMENT OF JUSTICE, Appellant.

Nos. 92–5261, 92–5262.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1992.

Decided Sept. 17, 1993.

Marina U. Braswell, Asst. U.S. Atty., argued the cause, for appellant. With her on the brief were Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John D. Bates, R. Craig Lawrence, and Michael J. Ryan, Asst. U.S. Attys.

David C. Vladeck argued the cause, for appellees. With him on the brief was Alan B. Morrison.

Before EDWARDS, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Department of Justice appeals a district court ruling ordering it to disclose the "Waldheim Report" and source documents and other materials relied on in its preparation. The Report is a 204-page document prepared for the Attorney General by the Office of Special Investigations, a unit within the Justice Department's Criminal Division, that details the wartime activities of Kurt Waldheim, the former Secretary-General of the United Nations and former President of Austria. It provided the basis for an order issued by the Attorney General barring Mr. Waldheim from entering the United States because of evidence that he may have participated in war crimes as an officer in the army of Nazi Germany. The district court ordered the release of these documents pursuant to the Freedom of Information Act.

We find that the great bulk of the Waldheim Report was properly withheld under Exemption 5 of the Act, which protects documents covered by the deliberative process privilege. We also find that an index to the source documents and other material appearing in the Justice Department's files were properly withheld pursuant to Exemption 7(A). Because we are unable to determine on the present record whether the remaining documents are also exempt from disclosure, we return the case to the district court.

## I. BACKGROUND

### A. Legal Context

Section 212 of the Immigration and Nationality Act lists classes of aliens who are to be excluded from entering the United States. 8 U.S.C. § 1182 (1988 & Supp. III 1991). The following provisions of section 212 are relevant to this case:

**1182. Excludable aliens**

**(a) Classes of excludable aliens**

Except as otherwise provided in this chapter, the following describes classes of excludable aliens who are ineligible to receive visas and who shall be excluded from admission into the United States:

\*       \*       \*       \*       \*       \*

**(3) Security and related grounds**

\*       \*       \*       \*       \*       \*

**(E) Participants in Nazi persecutions or genocide**

**(i) Participation in Nazi persecutions**

Any alien who, during the period beginning on March 23, 1933, and ending on May 8, 1945, under the direction of, or in association with—

(I) the Nazi government of Germany,

(II) any government in any area occupied by the military forces of the Nazi government of Germany,

(III) any government established with the assistance or cooperation of the Nazi government of Germany, or

(IV) any government which was an ally of the Nazi government of Germany,

ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion is excludable.

8 U.S.C. § 1182 (Supp. III 1991).

In order to enforce section 212's prohibitions on the entry of various classes of aliens into the United States, the Immigration and Naturalization Service ("INS") maintains two lists of excludable aliens. One, the National Immigration Lookout System, alerts immigration officials at ports of arrival that they

should deny entry to listed persons. The other, the Automated Visa Lookout System, alerts consular officials abroad that they should deny visas requested by listed persons. Although it appears that only the first of these lists is commonly known as the "Watchlist," for convenience, we will use the term to refer to both.

## B. Factual and Procedural History

In March 1986, in response to a request by the World Jewish Congress, the Justice Department initiated an investigation to determine whether Kurt Waldheim's World War II activities rendered him ineligible to enter the United States. The Attorney General assigned primary responsibility for the task to Neal Sher, Director of the Office of Special Investigations ("OSI"). Among the OSI's duties is responsibility for identifying, excluding, and deporting persons who acted in concert with the Nazi government's program of racial and religious persecution.

Over the next year or so, Mr. Sher, assisted by an OSI staff historian and other personnel, compiled source materials relating to Mr. Waldheim's activities and composed the document known as the Waldheim Report. According to the Justice Department, the staff preparing the Report had two objectives in mind: to provide the Attorney General with the information on which to decide whether Mr. Waldheim should be excluded from the United States, and to provide the means for defending a decision to exclude him against legal challenge. The staff historian combed various archives inside and outside the United States and examined papers submitted by Mr. Waldheim and others. He photocopied and retained in an "active file" all documents he thought relevant to the ultimate preparation of a report. Later, Mr. Sher directed the preparation of the document itself and forwarded it up the departmental chain of command to the Attorney General. The final product, the Waldheim Report, was a manuscript of 204 pages, plus photographs.

On April 27, 1987, the Attorney General announced his decision barring Mr. Waldheim, then President of Austria, from entering the United States. Accordingly, he directed that Mr. Waldheim's name be listed on both the National Immigration and Automated Visa Lookout Systems.

Shortly after the Attorney General's decision, John R. Mapother, a retired intelligence officer, and Stephen E. Nevas, a journalist, lodged Freedom of Information Act ("FOIA") requests with the Justice Department seeking access to material concerning Mr. Waldheim. These requests sought the Waldheim Report as well as "copies of the background material on which the OSI and the Attorney General relied when making [the decision to place Mr. Waldheim's name on the Watchlist] as well as copies of any summaries of and indexes to that material which were employed or are in the file." Statement of Material Facts To Which There Is No Genuine Issue at 1–2, *Nevas v. Department of Justice*, Nos. 89–0042, 89–0043, *reprinted in* Joint Appendix ("J.A.") at 14–15. After the Department refused to release the requested information, Messrs. Mapother and Nevas filed separate complaints in the district court, which were consolidated for trial.

The Department moved for summary judgment, claiming that the requested information was properly withheld pursuant to Exemptions 1, 5 (deliberative process and attorney work-product privileges), and 7(A), (C), and (D) of FOIA, 5 U.S.C. §§ 552(b)(1), (5), and 7(A), (C), and (D) (1988); whereupon, Messrs. Mapother and Nevas filed a cross-motion for summary judgment. On April 29, 1992, the district court granted their motion for summary judgment and ordered that

the Waldheim Report and the historical records which underlie it ... be released, subject to the following provisos: (1) those portions of the Waldheim Report containing conclusions, recommendations, or opinions need not be disclosed; (2) those historical records that the Department has asserted in this action are protected by Exemptions 1 [protecting the secrecy of information bearing on national defense or foreign policy] or 7(D) [protecting identity of confidential sources] of FOIA need not be released.

*Nevas v. Department of Justice*, 789 F.Supp. 445, 448–49 (D.D.C.1992).

After the April 29 order issued, the Justice Department moved for reconsideration, arguing, among other things, that the district court had failed to address the Department's claims under Exemptions 5 (attorney work-product privilege) and 7(C) (invasion of privacy). While this motion was pending, Mr. Waldheim's attorney, who had been monitoring the proceedings, addressed a letter to the district court on behalf of Mr. Waldheim. The letter waived any privacy rights of Mr. Waldheim that would have prevented the disclosure of the Report and its supporting materials. Shortly thereafter, on July 9, 1992, the day after Mr. Waldheim relinquished the Austrian presidency, the district court denied without comment the Justice Department's motion for reconsideration.

Because only the Justice Department has appealed the district court's order, this case is concerned with just those portions of the Waldheim Report and of "the historical records which underlie it" that were ordered released by the court. Although there seems to be some question as to the exact scope of the latter, we understand them to be limited to those documents in the active file that are either source materials or summaries and indexes relating thereto. Appellees affirm in their brief that they do not seek the release of drafts of the Waldheim Report or any correspondence or other papers reflecting internal agency discussions of proposed legal conclusions or recommendations, and the like.

## II. Discussion

### A. The Deliberative Process Privilege

The Department of Justice argues that all of the material whose disclosure was ordered by the district court, both the Waldheim Report itself and the source documents, indexes and summaries in the active file, were properly withheld under what is known as "the deliberative process privilege" embodied in FOIA's Exemption 5. While we express no opinion as to the status of the source documents and related materials under this exemption, we agree that the deliberative process privilege shields most of the Waldheim Report.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." 5 U.S.C. § 552(b)(5). Included within this exemption is the deliberative process privilege, which "protect[s] the decision-making processes of government agencies" and "encourage[s] the frank discussion of legal and policy issues" by ensuring that agencies are not "forced to operate in a fishbowl." *Wolfe v. Department of Health & Human Services*, 839 F.2d 768, 773 (D.C.Cir. 1988) (en banc) (internal quotation marks omitted). Nevertheless, this privilege, like all FOIA exemptions, must "be construed as narrowly as consistent with efficient Government operation." *Id.* at 773–74 (internal quotation marks omitted).

The deliberative process privilege protects materials that are both predecisional and deliberative. *Id.* at 774; *Petroleum Info. Corp. v. United States Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C.Cir.1992). In this case, there is no dispute that the Report was delivered to the Attorney General before he made his decision to exclude Mr. Waldheim. Hence, the Report is predecisional. Thus, it will be covered by the deliberative process privilege if, and only if, its contents are "deliberative" in character.

The deliberative character of agency documents can often be determined through "the simple test that factual material must be disclosed but advice and recommendations may be withheld." *Wolfe*, 839 F.2d at 774. Nevertheless, we have noted that the fact/opinion test, while offering "a quick, clear, and predictable rule of decision," is not infallible and must not be applied mechanically. *Id.* This is so because the privilege serves to protect the deliberative process itself, not merely documents containing deliberative material. *See id.; Mead Data Central, Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 256 (D.C.Cir.1977); *see also Montrose Chemical Corp. v. Train*, 491 F.2d 63, 68–71 (1974). Where an agency claims that disclosing factual material will reveal its deliberative processes, "we must examine the information requested in light of the policies and goals that underlie the deli-

berative process privilege." *Wolfe*, 839 F.2d at 774.

On several occasions, we have permitted agencies to withhold factual material on the ground that its disclosure would expose an agency's policy deliberations to unwarranted scrutiny. In *Montrose Chemical*, the Administrator of the Environmental Protection Agency asked three aides to summarize the more than 9,200–page record generated by an administrative proceeding in order to help him determine whether the pesticide DDT was injurious to the environment. 491 F.2d at 65. We upheld the Administrator's decision to withhold the summaries in the face of a later FOIA request, reasoning:

> To probe the summaries of record evidence would be the same as probing the decision-making process itself. To require disclosure of the summaries would result in publication of the evaluation and analysis of the multitudinous facts made by the Administrator's aides and in turn studied by him in making his decision. Whether he weighed the correct factors, whether his judgmental scales were finely adjusted and delicately operated, disappointed litigants may not probe his deliberative process.
>
> \* \* \* \* \* \*
>
> In effect, the litigants seek to know what advice as to importance and unimportance of facts the Administrator received, and how much of it he accepted.
>
> \* \* \* \* \* \*
>
> The work of the assistants in separating the wheat from the chaff is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator. And that some wheat is thrown away and some chaff included with the grain does not alter the nature of the process, even though it reflects error on the part of the assistants....

Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies. When a summary of factual material on the public record is prepared by the staff of an agency administrator, for his use in making a complex decision, such a summary is part of the deliberative process, and is exempt from disclosure under exemption 5 of FOIA.

*Montrose Chemical*, 491 F.2d at 68, 70, 71.

In *Russell v. Department of the Air Force*, 682 F.2d 1045 (D.C.Cir.1982), and again in *Dudman Communications Corp. v. Department of the Air Force*, 815 F.2d 1565 (D.C.Cir.1987), we shielded from disclosure draft versions of official Air Force histories. Each history covered certain Air Force operations conducted during the Vietnam War and was produced to inform future policy decisions. *Russell*, 682 F.2d at 1046, 1047; *Dudman Communications*, 815 F.2d at 1566. In *Russell*, we reasoned that "disclosure of the material sought ... would reveal the Air Force's deliberative process" because "a simple comparison between the pages sought and the [final, published] document would reveal what material supplied by subordinates senior officials judged appropriate for the history and what material they judged inappropriate." 682 F.2d at 1049; *see also Dudman Communications*, 815 F.2d at 1569 (reaffirming *Russell*'s rationale).

In this case, the task assigned the OSI staff was similar to that performed by the subordinate agency personnel in these earlier cases. The staff was to cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and to identify the significant issues they encountered along the way. It is in essence this task that the EPA Administrator's aides performed in *Montrose Chemical*, that the Air Force historians performed in *Russell* and *Dudman Communications*, and that our own judicial clerks perform in connection with many of the cases we decide. *Cf. Wolfe*, 839 F.2d at 775 n. 8 (noting that "courts have long looked by analogy to the needs of their own decision-making processes to assess claims of privilege based on the needs of executive decision-making"). It is true that the products of such labors can loosely be characterized as factual, in the sense that the issues ultimately being addressed have a prominent factual component: What is the evidence indicating that DDT is dangerous? What actions did the Air Force undertake, and what results did it achieve in a certain

set of operations? Was substantial evidence adduced on a particular point at trial? In cases such as this, however, the selection of the facts thought to be relevant clearly involves "the formulation or exercise of ... policy-oriented *judgment*" or "the process by which *policy* is formulated," *Petroleum Info. Corp.*, 976 F.2d at 1435 (emphasis in original), in the sense that it requires "exercises of discretion and judgment calls." *Id.* at 1438. Such tasks are not "essentially technical" in nature, *id.* at 1437–38; rather they are part of processes with which "[t]he deliberative process privilege ... is centrally concerned." *Id.* at 1435. Given the need for deliberation to inform discretion and for confidentiality to protect deliberation, we have felt bound to shelter factual summaries that were written to assist the making of a discretionary decision. Given this principle, which is most clearly reflected in *Montrose Chemical*, the Waldheim Report would appear to have been properly withheld.

To counter this precedent, appellees Mapother and Nevas cite an aside from *Montrose Chemical* and invoke our holding in *Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931 (D.C.Cir.1982). In *Montrose Chemical*, we closed our analysis with the remark that "[w]here the factual material is not already in the public domain, a different result might be reached." *Montrose Chemical*, 491 F.2d at 71. In *Playboy Enterprises*, we held that FOIA required the disclosure of a Department of Justice task force report (the "Rowe Report") concerning an FBI informant who had allegedly killed a civil rights worker involved in the 1965 Selma to Montgomery civil rights march. *Id.* at 933. That report had been ordered by the Attorney General at the behest of the Chairman of the Senate Judiciary Committee. *Id.* at 933, 936. In distinguishing *Playboy Enterprises* from *Montrose Chemical*, we explained that in the latter case,

> summaries were prepared for the sole purpose of assisting the Administrator to make a complex decision in an adjudicatory proceeding. Disclosure of the summaries would have permitted inquiry into the mental processes of the Administrator by revealing what materials he considered significant in reaching a proper decision,

and how he evaluated those materials. The Rowe Report on the other hand was prepared only to inform the Attorney General of facts which he in turn would make available to members of Congress.

*Id.* at 936.

To us, it is clear that *Montrose Chemical* governs this case, notwithstanding its suggestion that "a different result *might* be reached" in the case of information in the public domain. As our later cases make plain, the key to *Montrose Chemical* was not the relationship between the requested summaries and the public record, but that between the summaries and the decision announced by the EPA Administrator. *See Playboy Enterprises*, 677 F.2d at 936 (distinguishing *Montrose Chemical* on grounds that it involved "a complex decision in an adjudicatory proceeding" as opposed to an investigative report "prepared only to inform"); *Petroleum Info. Corp.*, 976 F.2d at 1437 (a "salient characteristic" of information eligible for protection under deliberative process privilege is its "association with a significant *policy* decision") (emphasis in original). Like the information requested in *Montrose Chemical*, the majority of the Waldheim Report's factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action. Therefore, we conclude that the Department properly withheld the product of this process.

█ Having examined the Report *in camera*, however, we find that one part of it fails these criteria and is therefore not covered by Exemption 5's deliberative process privilege. The exception is a section entitled "Chronology of Mr. Waldheim's Military Service" ("Chronology"). This section, though written in narrative form, is in substance an inventory, presented in chronological order, of Mr. Waldheim's ranks, postings, promotions, decorations, wounds, leaves from active duty, educational attainments, and the like, beginning with his entry into the Austrian army in the summer of 1936 and ending with his discharge from the German Wehrmacht on May 9, 1945. It is introduced by the state-

ment: "The following summary of [Mr. Waldheim's] military career ... is presented for purposes of orientation."

Unlike the remainder of the Report, the Chronology reflects no point of view. It has been organized strictly chronologically, not thematically. The selection of the categories of facts to be recorded in no way betrays the occasion that gave rise to its compilation. It is neither more nor less than a comprehensive collection of the essential facts of Mr. Waldheim's military career; no known datum in the selected categories has been omitted. Given all of this, the Chronology's relation to any Justice Department deliberations is simply too attenuated to be protected by the deliberative process privilege. Therefore, aside from the Chronology's first sentence and first footnote, which convey opinions, the section falls beyond the scope of this privilege. Because this information is "reasonably segregable" from the other parts of the Report, see 5 U.S.C. § 552(b), it is subject to disclosure unless shown to be protected by some other exemption.

B. Exemption 7(A)

The Justice Department also contends that all of the requested material was properly withheld pursuant to FOIA Exemption 7(A), which exempts from FOIA disclosure "records or information compiled for law enforcement purposes ... to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7). As we have found that all but the Chronology section of the Waldheim Report is covered by Exemption 5's deliberative process privilege, our inquiry will be limited to the Chronology and the source documents and other materials that are at issue in this appeal.

■■■ Based on our examination of the statutory language, its purpose, and the relevant case law, we conclude that to withhold documents pursuant to Exemption 7(A), an agency must show that they were compiled for law enforcement purposes and that their disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or *reasonably anticipat-*

*ed.* As to the first two of these requirements, the statutory language speaks for itself. *Cf. NLRB v. Robbins Tire and Rubber Co.,* 437 U.S. 214, 224–25, 98 S.Ct. 2311, 2318, 57 L.Ed.2d 159 (1978) (purpose of exemption is to "prevent '[harm] to the Government's case in court' by not allowing litigants 'early or greater access' to agency investigatory files than they would otherwise have" (citations omitted)). As to the last requirement, we have held that the exemption is available where enforcement proceedings are "pending or contemplated." *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 870 (D.C.Cir.1980). The word "contemplated," as used in *Coastal States,* speaks to the enforcing agency's intentions. For this, we have substituted "reasonably anticipated," a phrase that may be applied equally to cases in which the agency has the initiative in bringing an enforcement action and those, such as this one, in which it must be prepared to respond to a third party's challenge. The need for this more general standard will become clear below.

The district court held, however, that the Department of Justice's claims under the exemption failed two of the requirements listed above. First, the court doubted the "assumption that the term 'enforcement proceedings' embraces proceedings in which the Department is the defendant as opposed to the prosecutor or plaintiff." *Nevas,* 789 F.Supp. at 448 n. 3. But while it is true that the onus is on Mr. Waldheim (or someone acting on his behalf) to challenge his exclusion from the United States, the undisputed rule is that Exemption 7 "applies to civil and regulatory proceedings as well as to criminal matters." *Pope v. United States,* 599 F.2d 1383, 1386 (5th Cir.1979); *see also Rural Housing Alliance v. United States Dep't of Agriculture,* 498 F.2d 73, 81 n. 46 (D.C.Cir. 1974) ("The character of the statute violated would rarely make a material distinction, because the law enforcement purposes protected by exemption 7 include both civil and criminal purposes...."). Regulatory actions in particular are often taken unilaterally by an agency and then subjected to the post-decisional scrutiny of a reviewing court. *Cf.* 5 U.S.C. § 704 (subjecting to review "final

agency action for which there is no other adequate remedy"). For purposes of FOIA, then, we can see no essential difference between the procedures for adjudication and review available here and other such procedures that have been held to constitute "enforcement proceedings" within the meaning of Exemption 7(A). *See Southam News v. INS,* 674 F.Supp. 881, 887 (D.D.C.1987) (holding that disclosure of documents meant to assist "INS officers [in] ensur[ing] the exclusion of inadmissible aliens" was barred by Exemption 7(A) because it could "prejudice the enforcement program carried out by the INS"); *Timken Co. v. U.S. Customs Service,* 531 F.Supp. 194, 199 (D.D.C.1981) (holding that records were "compiled for law enforcement purposes" under FOIA where they pertained to a Customs Service "valuation investigation" whose results are subject to challenge before the USCS or appeal to the U.S. Customs Court).

Second, the district court relied even more heavily on its doubts that proceedings contesting Mr. Waldheim's exclusion would ever be brought. The court assessed the probability of such an occurrence at "next to nil," *Nevas,* 789 F.Supp. at 448, reasoning that "President Waldheim, not the Department, is in total control" of the initiation of such a challenge and that "[t]here is little realistic chance that the Austrian President would submit to the authority of the United States to determine whether he is a Nazi war criminal." *Id.* In their brief, appellees describe that possibility as utterly implausible because under the statutory procedures they cite, Mr. Waldheim would have to submit himself to the indignity of presenting himself at a point of entry into the United States without a visa, which would result in his detention. 8 U.S.C. § 1225(b). He would then have to run the gauntlet of administrative reviews, *id.* § 1226, before finally being able to challenge an adverse ruling in a habeas corpus proceeding in a district court. *Id.* at 1105a(b). We note, however, that legislation enacted in 1991 appears to permit a direct challenge to an exclusion order. *See* "Visa Lookout Systems" in notes accompanying 8 U.S.C. § 1182 (Supp. III 1991) (prohibiting inclusion on Watchlist of any person "not

excludable from the United States under the Immigration and Nationality Act").

Be that as it may, in addressing this requirement, it is necessary to take into account the difference between an enforcement action brought on an agency's own initiative and one that is triggered by the action of a third party. An exclusion order is issued on the sole authority of the Attorney General. Therefore, any proceedings to enforce it will take the form of a response to a challenge by or on behalf of the person who is the subject of the order. In the context of agency-initiated enforcement actions, we have said that proceedings must be "pending or contemplated," *Coastal States,* 617 F.2d at 870, noting that there was "no reason to protect yellowing documents contained in long-closed files." *Id.* It is one thing, of course, to determine whether proceedings within an agency's sole control are reasonably prospective; quite another to determine whether the prospect of a challenge is sufficiently real to justify the withholding of information that would prove critical to its case. We are persuaded that Exemption 7(A) may be invoked so long as such a challenge can reasonably be anticipated. Otherwise, the purpose for the exemption—to avoid prejudice to a prospective enforcement action—would be frustrated.

At the moment, no challenge to Mr. Waldheim's listing is pending; and determining whether he is likely to mount one is hampered by the absence from these proceedings of Mr. Waldheim, the person most likely to do so. As a consequence, the parties are left to speculate as to the factors he might weigh or the decision he might reach in considering whether to contest his listing. The Justice Department contends that Mr. Waldheim's recent return to private life, or even the disclosures sought in this litigation, could spur him into action. Appellees reply that Mr. Waldheim is unlikely to place his reputation on the line in proceedings where the presumptions run in the Justice Department's favor. The Department cites Mr. Waldheim's threatened litigation and notes that his Watchlist listing has already been contested once in court by a third party acting on his own initiative. *See St. Hilaire*

*v. Department of Justice,* 1992 WL 73545 (D.D.C. Mar. 18, 1992). To this, appellees respond that any third-party challenge is likely to founder on the shoals of the injury-in-fact prong of the standing doctrine, as did the one in *St. Hilaire. See St. Hilaire,* 1992 WL 73545 at *1–*2.

The implicit assumption underlying the parties' arguments is that we must assess the probability that a particular individual, Mr. Waldheim, will challenge his exclusion. The corollary to this assumption is that we must decide this case based on a few shreds of objective fact plus a dose of conjecture as to the motivations of an individual not before us. But in an Exemption 7(A) case in which the issue was whether a disclosure would cause impermissible interference with a pending enforcement proceeding, the Supreme Court held that a lower court erred by eschewing "generic determinations of likely interference," *Robbins,* 437 U.S. at 236, 98 S.Ct. at 2324, in favor of examining "the possibility of actual interference in [the] individual case," *id.* at 218, 98 S.Ct. at 2315. We think the parties have made the same mistake here.

In *United States Dep't of Justice v. Reporters Committee for Freedom of the Press,* the Supreme Court encouraged the making of "categorical decisions" in deciding whether material requested under FOIA is exempt. 489 U.S. 749, 776, 109 S.Ct. 1468, 1483, 103 L.Ed.2d 774 (1989); *see also Dunkelberger v. Department of Justice,* 906 F.2d 779, 782 (D.C.Cir.1990) (*Reporters Committee* permits balancing of competing interests "on a categorical basis" in appropriate cases); *North v. Walsh,* 881 F.2d 1088, 1097 n. 13 (D.C.Cir. 1989) (Government may withhold documents category by category). Specifically, the Court noted that *Robbins* and other cases "provide support for the proposition that categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristically tips in one direction." 489 U.S. at 776, 109 S.Ct. at 1483. It stated that this approach "implements the congressional intent to provide 'workable' rules.... Only by construing the [exemption at issue] to provide a categorical rule can [FOIA's] purpose of expediting disclosure by means of workable rules be furthered." *Id.* at 779, 109 S.Ct. at 1485 (quoting *FTC v. Grolier, Inc.,* 462 U.S. 19, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983)). We believe that a categorical approach is appropriate in determining the likelihood of enforcement proceedings in cases where an alien is excluded from entry into the United States because of his alleged participation in Nazi persecutions or genocide. Otherwise, we must exercise our faculties as mind-readers.

The critical question facing us, then, is not whether Mr. Waldheim is likely to appeal his listing, but whether, in the run of cases involving persons excluded from the United States under section 1182(a)(3)(E)(i), there is a reasonable likelihood of a challenge. Although the district court did not direct its attention to this issue, we think it plain that the prospect of such a challenge is not so unreasonable as to permit us to affirm the district court's ruling. The desire of many tens of thousands of aliens to enter the United States is too manifest, and the crimes committed by the Nazis too heinous, to permit the assumption that an exclusion order will not be challenged. We hold, then, that in such cases—and therefore in this one— Exemption 7(A)'s requirement that enforcement proceedings be reasonably anticipated is met.

The remaining issue is whether the immediate disclosure of the material could reasonably be expected to interfere with any proceedings that in fact occur. As noted above, *Robbins* requires that we assess this possibility generically.

To support its exemption claim on this point, the Department submitted to the district court an affidavit stating:

[disclosure] would allow possible fabrication of alibis and/or other exculpatory evidence, contact with potential witnesses, and would allow the identification of any weaknesses in the government's evidence that may be unfairly exploited by Waldheim. It must be remembered that only Waldheim knows the exact nature of every moment of his service during World War II. If he knew exactly what information the government had, he would also know

what we did not have, and could tailor his challenge accordingly.

Declaration of Frank R. Newett at 12, *Nevas v. Department of Justice*, Nos. 89–0042, 89–0043 ("Newett Declaration"), *reprinted in* J.A. at 43. In *Alyeska Pipeline Service Co. v. U.S. EPA*, 856 F.2d 309 (D.C.Cir.1988), we held that essentially similar representations were sufficient to warrant the withholding of incriminating corporate documents that had been obtained by the EPA. *Id.* at 312–13 (finding that such "justifications ... have achieved recognition in Exemption 7 case-law"). In this case, unlike *Alyeska,* the Department must reconstruct events at a distance of a half century or more. Inevitably, it must contend with memories that have faded, documents that have been lost, and the tendency of witnesses to obfuscate their dealings with one of the greatest criminal enterprises in history. Thus, the considerations that we held sufficient to bar disclosure in *Alyeska* might well be even more compelling here.

Reviewing the record in its present state, however, we are able to identify only one document that is clearly covered by Exemption 7(A). According to the Newett Declaration, there exists "a forty-three (43) page index of all documents in the Waldheim active file," including all of "those documents the authors [of the Waldheim Report] thought to be significant in setting forth the case concerning Waldheim." Newett Declaration at 13, J.A. at 44. Any such index will provide a virtual road map through the OSI's evidence; and because it identifies the gleanings from a mass of potential evidence that the agency considers probative of its case, its disclosure is apt to provide critical insights into its legal thinking and strategy. Heeding *Robbins*'s categorical approach, we have little trouble concluding that the premature disclosure of such an index could prejudice a typical enforcement proceeding. Uppermost in the minds of any persons implicated in the crimes described in section 1182(a)(3)(E)(i) must be a single question: What evidence of these alleged crimes has survived the war to fall into the hands of my accusers? An index such as this one would provide the answer.

We cannot decide, on this record, whether the remaining documents were properly ordered released. Because the district court had concluded that there was no likelihood "of any proceeding occurring here that would justify invoking Exemption 7(A)," it rejected this defense to disclosure. *Nevas,* 789 F.Supp. at 448. As a consequence, we do not have the benefit of the court's review of the materials to determine whether their release would prove prejudicial to the Department's case should an enforcement action in fact take place. Nor do we have its assessment of what non-exempt portions of otherwise exempt materials are "reasonably segregable" and therefore subject to disclosure. *See* 5 U.S.C. § 552(b). Under these circumstances, we must remand the remainder of the Department's Exemption 7(A) claims.

On remand, the district court should consider whether any of the documents that we have not found to have been properly withheld are privileged under Exemption 7(A). *Cf.* Newett Declaration at 15–28, J.A. at 46–59 (listing the contents of the active file). In doing so the court should be mindful of *Robbins*'s requirement that courts consider whether the materials are of the "particular kinds" whose release "would *generally* 'interfere with enforcement proceedings.'" 437 U.S. at 236, 98 S.Ct. at 2324 (emphasis added).

## C. Work–Product Privilege and Exemption 7(C)

█ The Justice Department also claims that all of the requested materials fall within two additional FOIA exemptions: the work-product privilege, which like the deliberative process privilege has been incorporated into Exemption 5, *see Delaney, Migdail & Young Chartered v. IRS*, 826 F.2d 124, 126 (D.C.Cir. 1987) (Exemption 5 "encompasses the attorney work-product rule"), and FOIA Exemption 7(C), which protects

> records or information compiled for law enforcement purposes ... to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy.

5 U.S.C. § 552(b)(7). We need consider here the applicability of these exemptions only to the materials that we have found are not protected by either the deliberative process privilege or Exemption 7(A). As to those materials, we are able on this record to decide the claims only as they relate to the Chronology. We find that that document is not protected by either of the exemptions.

Because Mr. Waldheim has waived his own privacy interests, the Justice Department defends its Exemption 7(C) claim by arguing that the requested disclosures could invade the privacy of others. The Chronology, however, mentions no one other than Mr. Waldheim himself. With respect to the work-product doctrine, the Department argues that the entire Waldheim Report is protected because Mr. Sher was contemplating litigation when he compiled it. *Cf. Delaney*, 826 F.2d at 126 (work-product privilege applies to "documents prepared in anticipation of litigation"). But while this may be true with regard to the Report as a whole, it is plainly untrue with regard to the Chronology. A glance at that section confirms what it itself acknowledges: that its specific purpose was to orient its immediate audience, the Attorney General and his advisors, to the complex of facts set forth in the body of the Report. Although other parts of the Report may indeed have been prepared with an eye toward litigation, this one plainly was prepared to inform an impending round of deliberations. Given its segregability from the remainder of the Report, the Chronology is not sheltered by the work-product rule.

As we noted earlier, although the Justice Department had claimed these exemptions in its motions for summary judgment and for reconsideration, the court failed to address them. Again, as in the case of the Department's Exemption 7(A) claim, we are unable to resolve the remaining attorney work-product and Exemption 7(C) claims on the present record. Accordingly, we must ask the district court to consider these as well on remand.

### III. Conclusion

This case has required us to assess whether a variety of documents are exempt from disclosure under the Freedom of Information Act. We have held that (1) the Waldheim Report, apart from its Chronology section, is shielded by the deliberative process privilege; (2) the index to the Office of Special Investigations' active file falls within Exemption 7(A); and (3) the Chronology is covered by neither the two Exemption 5 privileges nor Exemption 7(C), although we cannot determine its status under Exemption 7(A). Accordingly, we vacate the district court's order granting summary judgment for Messrs. Mapother and Nevas, grant the Justice Department's request for summary judgment as to those documents that we have found to have been properly withheld, and remand the remainder of the disclosure requests for further consideration in the light of today's decision.

*So ordered.*