# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 12, 2013        Decided May 20, 2014

No. 12-5201

NATIONAL SECURITY ARCHIVE,
APPELLANT

v.

CENTRAL INTELLIGENCE AGENCY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00724)

*Allon Kedem* argued the cause for appellant. With him on the briefs was *Clifford M. Sloan*.

*Gregory G. Katsas*, *Kristen A. Lejnieks*, and *Tiffany D. Lipscomb-Jackson* were on the brief for *amicus curiae* The National Coalition for History in support of appellant.

*Mitchell P. Zeff*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Senior Circuit Judge* WILLIAMS joins.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAVANAUGH, *Circuit Judge*:  In the spring of 1961, some 1,400 Cuban exiles landed on the banks of the Bahía de Cochinos, the Bay of Pigs.  They were supported by the Central Intelligence Agency and U.S. military.  Their objective was to conquer the beach, nullify Fidel Castro's air superiority with B-26 bombers and U.S. air support, and hunker down until the inevitable democratic revolution.  But the revolution never came.  Nor did sufficient supplies or air support.  Instead, American pilots were shot down, and most of the exiles were captured and imprisoned.

The now-infamous operation has been the subject of much debate and analysis.  Within that genre, one account of the Bay of Pigs invasion is unique because it was written in the Central Intelligence Agency.  Beginning in 1973, CIA staff historian Dr. Jack B. Pfeiffer drafted what became a five-volume opus, starting with the CIA's plans for the air operation and concluding with Dr. Pfeiffer's assessment of the operation.

Dr. Pfeiffer's drafts of Volumes I through III ultimately were revised and released to the public by the CIA.  The CIA also publicly released Dr. Pfeiffer's draft of Volume IV.  But the CIA has not released the draft of Volume V.

In 2005, a non-profit research institute known as the National Security Archive submitted a request to the CIA under the Freedom of Information Act seeking, as relevant here, Dr. Pfeiffer's draft of Volume V.  (To avoid confusion, we will refer to the non-profit National Security Archive as

the "FOIA requester.")  The CIA claims that the draft of Volume V is exempt from disclosure under Exemption 5 of FOIA.  The District Court agreed and granted summary judgment to the CIA.  Our review of the District Court's decision is de novo, and we affirm.

* * *

Exemption 5 of the Freedom of Information Act protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 encompasses the privileges that the Government could assert in civil litigation against a private litigant, such as the attorney-client privilege, the attorney work product privilege, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege. *See Baker & Hostetler LLP v. Department of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006).

The CIA here invokes the deliberative process privilege.  A form of executive privilege, the deliberative process privilege covers deliberative, pre-decisional communications within the Executive Branch.  One of the rationales for the privilege is to encourage the candid and frank exchange of ideas in the agency's decisionmaking process.  "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705 (1974).  This is a concern as old as the Republic.  Indeed, at the Constitutional Convention itself, the delegates agreed at the outset that none of the deliberations would be shared with outsiders, and the records were kept secret for more than 30 years. *See Nixon v.*

*Administrator of General Services*, 433 U.S. 425, 447 n.11 (1977).

The modern application of the deliberative process privilege rests on the same understanding that motivated the Framers in Philadelphia: If agencies were "to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer." *Dudman Communications Corp. v. Department of the Air Force*, 815 F.2d 1565, 1567 (D.C. Cir. 1987) (internal quotation marks and citation omitted). In other words, agency officials "should be judged by what they decided, not for matters they considered before making up their minds." *Russell v. Department of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (quotation omitted).

The deliberative process privilege covers communications that are pre-decisional and deliberative. *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). To be pre-decisional, the communication (not surprisingly) must have occurred before any final agency decision on the relevant matter. *See id.* As this Court has previously noted, the term "deliberative" does not add a great deal of substance to the term "pre-decisional." *See Access Reports v. Department of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991). The term "deliberative" in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue. *See Russell*, 682 F.2d at 1048.

In delineating the scope of the deliberative process privilege, we have held that an agency's official history is a final agency decision. An agency history constitutes the agency's "official statement" concerning the agency's prior actions, and it helps educate future agency decisionmakers.

*Id.* (Air Force history of the use of herbicide in Vietnam); *see Dudman Communications*, 815 F.2d at 1566 (Air Force history of involvement in South Vietnam).

In turn, we have held that a *draft* of an agency's official history is pre-decisional and deliberative, and thus protected under the deliberative process privilege. *See Dudman Communications*, 815 F.2d at 1568-69; *Russell*, 682 F.2d at 1048-49. Those precedents pose a substantial hurdle to the FOIA requester's claim in this case.

To overcome those precedents and obtain release of Dr. Pfeiffer's draft of Volume V, the FOIA requester asserts a string of arguments. None is persuasive.

*First*, the FOIA requester points out that there was no final CIA history that arose out of or corresponded to Volume V. That is true, but we do not see the relevance of the point. There may be no final agency document because a draft died on the vine. But the draft is still a draft and thus still pre-decisional and deliberative. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975). A Presidential speechwriter may prepare a draft speech that the President never gives. A Justice Department aide may give the Attorney General a draft regulation that the Attorney General never issues. Those kinds of documents are no less drafts than the drafts that actually evolve into final Executive Branch actions. Moreover, the writer does not know at the time of writing whether the draft will evolve into a final document. But the writer needs to know at the time of writing that the privilege will apply and that the draft will remain confidential, in order for the writer to feel free to provide candid analysis. A privilege contingent on later events – such as whether the draft ultimately evolved into a final agency position – would be an uncertain privilege, and as the

Supreme Court has said, an uncertain privilege is "little better than no privilege at all." *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981); *see also Swidler & Berlin v. United States*, 524 U.S. 399, 408-09 (1998). In short, to require release of drafts that never result in final agency action would discourage innovative and candid internal proposals by agency officials and thereby contravene the purposes of the privilege.

*Second*, the FOIA requester says that the CIA has released similar information regarding the Bay of Pigs operation, including the other volumes. However, an agency does not forfeit the benefit of a FOIA exemption simply because of its prior decision to voluntarily release other similar information. *See Army Times Publishing Co. v. Department of the Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993) (Air Force had not "'waived' its right to claim an exemption from disclosure simply because it has released information similar to that requested"). Indeed, penalizing agencies in that way would discourage them from voluntarily releasing information, which would thwart the broader objective of transparent and open government.

*Third*, the FOIA requester claims that the CIA has identified no concrete harm that would result from release of the draft of Volume V. But as we have said before, "Congress enacted FOIA Exemption 5 . . . precisely because it determined that disclosure of material that is both predecisional and deliberative *does* harm an agency's decisionmaking process." *McKinley v. Board of Governors of the Federal Reserve System*, 647 F.3d 331, 339 (D.C. Cir. 2011). The harm from release is, among other things, the harm to the candor of present and future agency decisionmaking. Courts may not "second-guess that congressional judgment on a case-by-case basis." *Id.*

*Fourth*, the FOIA requester contends that the passage of time since Dr. Pfeiffer wrote his draft renders the deliberative process privilege inapplicable here. According to the FOIA requester, the CIA's interest in protecting any contentious or sensitive issues discussed in the draft of Volume V has diminished over time. But unlike some statutes, such as certain provisions of the Presidential Records Act, *see* 44 U.S.C. § 2204(a), Exemption 5 of FOIA does not contain a time limit.[1] We must adhere to the text of FOIA and cannot judicially invent a new time limit for Exemption 5. *See generally Milner v. Department of the Navy*, 131 S. Ct. 1259 (2011).

Moreover, privileges that are intended to facilitate candid communication, such as the deliberative process privilege, generally do not have an expiration date. That makes sense because such a privilege otherwise would not fully serve its purposes. As we have noted, in order for a privilege to encourage frank and candid debate, the speaker or writer must have some strong assurance at the time of the communication that the communication will remain confidential. Premature release of material protected by the deliberative process privilege would have the effect of chilling current and future agency decisionmaking because agency officials – realizing that the privilege evaporates over time – would no longer have the assurance that their communications would remain protected. And without that assurance, they in turn would not feel as free to advance the frank and candid ideas and advice that help agencies make good decisions. *See generally*

---

[1] By its terms, moreover, the Presidential Records Act does not and could not "limit . . . any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2). So the time limit in that Act, as applied to those privileges, changes the procedure for asserting the privilege, not the scope or duration of the privilege.

*Swidler & Berlin*, 524 U.S. at 407-08; *Access Reports*, 926 F.2d at 1196. In addition, looking backward, premature release of privileged information would risk embarrassment of individuals who had put forth certain ideas on the understanding and assurance that their communications would remain confidential. To avoid such an unfair bait and switch, among other reasons, the Supreme Court has recognized that a privilege designed to encourage candid communications must be durable and lasting. *See Swidler & Berlin*, 524 U.S. at 407-08 (involving attorney-client privilege). In short, we reject the FOIA requester's argument that the deliberative process privilege applicable to Dr. Pfeiffer's draft has somehow expired.

*Fifth*, even if its arguments for the entire draft of Volume V are unavailing, the FOIA requester contends that some portions of the draft may contain factual material that is not protected by the deliberative process privilege and is "reasonably segregable." 5 U.S.C. § 552(b). The District Court concluded that the entirety of the draft is protected by Exemption 5. The District Court's decision adheres to our precedents in this context. Our cases have made clear that a draft agency history may not be dissected by the courts in the manner suggested by the FOIA requester here. *See Dudman Communications*, 815 F.2d at 1568-69; *Russell*, 682 F.2d at 1048-49. In producing a draft agency history, the writer necessarily must "cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose," and "identify the significant issues." *Mapother v. Department of Justice*, 3 F.3d 1533, 1538 (D.C. Cir. 1993). In doing so, "the selection of the facts thought to be relevant" is part of the deliberative process; it necessarily involves "policy-oriented judgment." *Id.* at 1539 (internal quotation marks omitted); *see also Horowitz v. Peace Corps*, 428 F.3d 271, 276-77 (D.C. Cir. 2005); *Wolfe v. Department of Health & Human*

*Services*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc); *Lead Industries Association, Inc. v. OSHA*, 610 F.2d 70, 85 (2d Cir. 1979).

Applying that reasoning in *Russell* and *Dudman*, we held that draft versions of official Air Force histories were exempt from disclosure. *See Dudman Communications*, 815 F.2d at 1568-69; *Russell*, 682 F.2d at 1048-49. We must reach the same result here when assessing Dr. Pfeiffer's draft history. In the narrow confines of this case, which involves a draft agency history, we agree with the District Court that the draft of Volume V is exempt in its entirety under Exemption 5. To be clear, as we emphasized in *Dudman*, if a person "requests particular factual material – *e.g.*, material relating to an investigation of a war crime – an agency cannot withhold the material merely by stating that it is in a draft document. . . . The exemption plainly applies in this case because [the FOIA requester] asked not for particular factual material, but for the draft in which [the FOIA requester] thought the material could be found." 815 F.2d at 1569.

\* \* \*

We affirm the judgment of the District Court.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting. In 2005, the National Security Archive requested disclosure of "[t]he fourth and fifth volumes of the Official History of the Bay of Pigs Operation" pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Because the draft of Volume IV (entitled "The Taylor Committee Investigation of the Bay of Pigs") was publicly released in response to the FOIA request, the request at issue is for release of a draft of Volume V (entitled "CIA's Internal Investigation of the Bay of Pigs Operation") that was prepared with the other four volumes between 1973 and 1984 by a staff historian at the Central Intelligence Agency. Volumes I through IV have been publicly released; release of the fifth volume has been withheld by the agency pursuant to FOIA Exemptions 1, 3 and 5. The district court upheld its non-release based on Exemption 5. Because the agency's current declarations fail to meet its burden to show the draft is fully protected from disclosure under Exemption 5, I would remand the case to the district court for further consideration.

Congress enacted FOIA Exemption 5, incorporating the deliberative process privilege, to protect against the harm to an agency's decisionmaking process that results from the disclosure of material that is both predecisional and deliberative. *See McKinley v. Bd. of Governors of Fed. Reserve*, 647 F.3d 331, 339 (D.C. Cir. 2011); *accord Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc). The exemption is designed to protect "materials [that] can reasonably be said to embody an agency's policy-informed or -informing judgmental process." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). Consistent with "the [FOIA's] goal of broad disclosure," the Supreme Court has "insisted that the exemptions be given a narrow compass." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1265 (2011) (citations and internal quotation marks omitted). More particularly, the Supreme Court has instructed that the deliberative process privilege under Exemption 5 "has finite

limits," *EPA v. Mink*, 410 U.S. 73, 87 (1973) and "requires different treatment for materials reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other," *id.* at 89 (footnote omitted).

This court also has emphasized that the privilege "serves to protect the deliberative process itself, not merely documents containing deliberative material." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). "A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates," and "[a]ccordingly . . . a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" *Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1981)). Although a document need not "contribute to a single, discrete decision," *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C. Cir. 1991), an agency must "identify[] the decisionmaking process to which [the document] contributed," *id.* at 1197. The court has thus treated certain draft agency histories as protected from disclosure under Exemption 5, reasoning that the "disclosure of editorial judgments" made during the agency's deliberative process "would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work." *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987); *see Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982). In each case, the court shielded draft histories from disclosure because the agency's deliberative process would be revealed by means of "'a simple comparison between the pages sought and the final, published document," which "would reveal what material supplied by subordinates senior officials judged appropriate for the history and" what they did not. *Mapother*, 3 F.3d at 1538 (quoting *Russell*, 682 F.2d at 1049, and noting that *Dudman*

*Commc'ns*, 815 F.2d at 1569, reaffirmed *Russell*'s rationale).

Here, the agency identifies the "final history of the Bay of Pigs Operation" as the relevant agency decision, *see* Appellee's Br. 10, and defends withholding the draft of Volume V on the ground that release "could be expected to . . . discourage open and frank deliberations among the History Staff" and "lead to public confusion," Decl. of David S. Robarge ¶ 9 (Nov. 17, 2011); *see Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772–73 (D.C. Cir. 1978) (en banc). The Chief Historian states, categorically, that release of "*any* . . . draft history at *any* stage before its completion" as an official agency publication "could be expected to . . . discourage open and frank deliberations." Robarge Decl. ¶ 9 (emphasis added). The Chief Historian views "[t]he back-and-forth peer review process" as "critical to ensuring that any final history is both objective and accurate." *Id*. ¶ 10. According to the Chief Historian, the "histories provide . . . intelligence officers, managers and decision-makers with . . . shared institutional memory regarding historical events for use in current decision-making." *Id.* ¶ 4.

"[T]he key question in Exemption 5 cases" is "whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns*, 815 F.2d at 1568. All except the draft of Volume V of the History have been publicly released. In response to a related FOIA request, the agency released Volumes I, II, and IV with "minimal redactions" under FOIA Exemptions 1 and 3, in 2011. *See* Decl. of Martha Lutz, Information Review Officer ¶ 14 (Sept. 26, 2011). Volume III was released in 1998 pursuant to the Kennedy Assassination Records Act. *Id*. ¶ 16. Significantly as well, the agency released Volume IV in 1987 as

a "draft document," *id.* ¶ 17, "before its completion" as an official agency document, Robarge Decl. ¶ 9, in response to the staff historian's own FOIA request and re-released the draft with fewer redactions in response to the current FOIA request, *see* Lutz Decl. ¶ 17.

Of course, an agency does not "'waive[]' its right to claim an exemption from disclosure simply because it has released information similar to that requested." *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993). But at this point the agency's FOIA-related release of the draft of Volume IV appears from the record to be "fundamentally inconsistent with [the agency's categorical] claim that release of [the draft of Volume V] would threaten the decisionmaking process of the agency." *Id.* at 1070. Even assuming the draft of Volume V is predecisional, there is neither a final version of Volume V nor anything in the record to suggest that comparing the draft with the other four volumes would implicate the rationale of *Dudman Communications* and *Russell.* The draft of Volume V, moreover, was rejected at the first stage of the agency's review process, *see* Lutz Decl. ¶ 20, and was not part of the agency "give-and-take of the deliberative process by which the decision itself is made," *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975).

Yet today the majority reads *Dudman Communications* and *Russell* as calling for a *per se* rule of Exemption 5 protection for draft agency histories. *See* Op. at [5]. The court states that "a *draft* of an agency's official history is pre-decisional and deliberative, and thus protected under the deliberative process privilege," *id.* (citing *Dudman Commc'ns*, 815 F.2d at 1568–69, and *Russell*, 682 F.2d at 1048), and that although a draft history may "die[] on the vine . . . . the draft is still a draft and thus still pre-decisional and deliberative," *id.* Designation of a document as a draft, however, "does not end the inquiry," *Arthur Andersen*

*& Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)), much less demonstrate that an agency has met its burden to justify its withholding under Exemption 5 by identifying the role of the individual document in the deliberative process, *see, e.g.*, *Access Reports*, 926 F.2d at 1196; *Coastal States*, 617 F.2d at 868.  It is one thing to conclude that disclosure of a draft could "stifle . . . creative thinking and candid exchange of ideas," *Dudman Communications*, 815 F.2d at 1569, where it is possible to identify editorial judgments by comparing the draft and the final version, and quite another to conclude stifling could occur where there is no final version and the agency has identified the requested document as reflecting no more than the individual staff historian's view.  Troubling as well is the fact that the agency has criticized the staff historian's work on the draft of Volume V in a declaration filed in the public record of the instant case — stating that in 1981 and 1984 the Chief Historian thought the draft "had serious deficiencies as a historical study" and "offers a polemic of recriminations against CIA officers who later criticized the operation, and against those U.S. officials who [the staff historian] contends were responsible for its failure," Decl. of J. Kenneth McDonald, CIA Chief Historian ¶¶ 6, 13 (Nov. 4, 1987) — while denying any opportunity for the work to speak for itself (even in redacted form); these circumstances, no less than disclosure, could cause current and future staff historians to curtail the candor and creative flair that the agency values as part of its History process.

Neither the majority opinion nor the agency's current declarations explain why this *particular* draft document is deliberative, *i.e.*, why release of the draft of Volume V "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."

*Dudman Commc'ns*, 815 F.2d at 1568. The agency claims that the draft of Volume V is "reflective of the iterative review process of the CIA's History Staff" and "reflects the give and take of the consultative process." Robarge Decl. ¶ 16. But the agency also avers that the draft of Volume V "never proceeded beyond the first stage of the CIA review process," Lutz Decl. ¶ 20, "was never circulated within the [a]gency," Robarge Decl. ¶ 15, "does *not* incorporate information and perspectives that would arise from the internal review process," *id.* ¶ 14 (emphasis added), and "represents the view of merely one staff historian," *id.* ¶ 12. From the current record we know the Chief Historian in 1987 addressed potential harm from release of the draft of Volume V. *See* McDonald Decl. ¶¶ 13–14. But the agency's subsequent declarations do not incorporate that analysis, adopting instead only the description of the History development process, *see* Lutz Decl. ¶ 22, and the explanation of why the draft of Volume V was rejected, *see* Robarge Decl. ¶ 13. Notably, the 1987 declaration assumed that the draft of Volume V "will eventually go through the full revision, editing and review process" and "later drafts or the final form of this history may be compared to [the staff historian]'s version to determine what changes in evidence, argument and interpretation were made in completing this work." McDonald Decl. ¶ 14. In 2011, however, the Chief Historian advised that "[a]lthough Dr. McDonald hoped that Volume V could be edited to a final version, these efforts were unsuccessful." Robarge Decl. ¶ 15. And, of course, the 1987 declaration preceded the agency's subsequent decisions to release other volumes of the "unfinished" History, Robarge Decl. ¶ 12, including a draft of Volume IV. As noted, the 1987 explanation for withholding the draft of Volume V appears to apply equally to the draft of Volume IV, which the agency has twice publicly released, and no agency declaration has explained why the two drafts should be treated differently for purposes of Exemption 5. The rationale of *Dudman Communications* and *Russell* also

affords no dispositive answer in the absence of a final version of Volume V with which to compare the draft now sought. Given the post-1987 public releases of the other volumes of the "unfinished" History, and because "disclosure, not secrecy, is the dominant objective of the Act," *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976), the agency's present reliance on a categorical approach for withholding the draft of Volume V under Exemption 5 does not satisfy the agency's burden under the FOIA.

To the extent the majority's opinion suggests that agency draft histories are also excused from the statutory requirement that any "reasonably segregable," non-exempt material be released to the requester, *see* 5 U.S.C. § 552(b), *Dudman Communications* indicated otherwise. There the court rejected the argument that withholding release of agency histories under Exemption 5 "will allow agencies to hide all manner of factual information from public view," stating:

> Our holding . . . can have no such effect. If a person requests particular factual material — *e.g.*, material relating to an investigation of a war crime — an agency cannot withhold the material merely by stating that it is in a draft document. In such a case, the agency will usually be able to excise the material from the draft document and disguise the material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process. When the agency can take such steps, it may not withhold the information under Exemption 5.

*Dudman Commc'ns*, 815 F.2d at 1569; *see Vaughn*, 523 F.2d at 1143–44; *Arthur Andersen*, 679 F.2d at 257–58. The court has "shelter[ed] factual summaries that were written to assist the making of a discretionary decision," *Mapother*, 3 F.3d at 1539

(citing *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63 (D.C. Cir. 1974)), and it is conceivable that a draft history could include factual summaries that reflect deliberative judgments. Notwithstanding his criticisms of the staff historian's work on a "preliminary draft" of Volume V, the Chief Historian stated in 1987 that the "research material and drafts will doubtless be of value" to a staff historian assigned to complete the History. McDonald Decl. ¶ 6. This is not a sufficient response here.

Exemption 5 reaches factual material only if it is "assembled through an exercise of judgment" and does not extend, for example, to a mere "inventory, presented in chronological order," *Mapother*, 3 F.3d at 1539. Before granting summary judgment the district court did not review the draft of Volume V *in camera* — review that the Supreme Court has observed is "often . . . required . . . in order to determine which [documents] should be turned over or withheld," *Mink*, 410 U.S. at 88 — and the agency has provided this court no basis to conclude that all factual material in the draft history reflects deliberative judgments. The declaration of the agency's Information Review Officer sheds no light on segregability, stating only that the draft of Volume V "contains no reasonably segregable information since the entire document is a draft." Lutz Decl. ¶ 25. Such a "vague and conclusory" statement is "inadequate" to support summary judgment. *PHE, Inc. v. Dep't of Justice*, 983 F.2d 248, 252–53 (D.C. Cir. 1993). "[A] blanket claim of privilege under Exemption 5," *Army Times Publ'g*, 998 F.2d at 1071, appears, at this point, to be unwarranted in light of the release of a draft of Volume IV and the agency's acknowledgments about the draft of Volume V, namely that it contains only "a small amount of classified information," Lutz Decl. ¶ 14, and that it addresses a 1961 investigation by the

agency's Inspector General whose report the agency released in 1997.[1]

Neither *Dudman Communications* nor *Russell* cited the segregability provision in 5 U.S.C. § 552(b). Since those cases were decided this court has held that, regardless of whether a request for segregability is made, "'a district court clearly errs when it approves the government's withholding of information under the FOIA without making an express finding on segregability,'" *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) (quoting *PHE, Inc.*, 983 F.2d at 252), and that "failure to fulfill this responsibility requires a remand," *id*. The district court stated that "the entirety of Volume V is covered by Exemption 5," *Nat'l Sec. Archive v. CIA*, 859 F. Supp. 2d 65, 68 n.2 (D.D.C. 2012), but this statement was made in the context of explaining why it was unnecessary to address the agency's invocation of FOIA Exemptions 1 and 3, not whether any portions of the draft of Volume V were reasonably segregable and non-exempt.

Accordingly, I would reverse the grant of summary judgment and remand the case to the district court for further consideration. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, No. 12-5223, slip op. at 18 (D.C. Cir. Apr. 1, 2014). The agency may be able to demonstrate its withholding of the entirety of the draft of Volume V is justified under Exemption 5, but its current declarations do not meet its "burden of proving," the categorical applicability of the deliberative process privilege, *Ancient Coin Collectors Guild v.*

---

[1] *See* Appellant's Br. 13 n.5 (citing Inspector General's Survey of the Cuban Operation and Associated Documents (1961) (indicating release through CIA Historical Review Program in 1997), *available at* http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB341/ IGrpt1.pdf)

10

*U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011); *see U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989). Likewise, it is possible that segregating and releasing non-exempt portions of the draft of Volume V may be unwarranted, but the district court has yet to make that requisite "express finding." On remand, the district court's reevaluation of Exemption 5 should include consideration of the effect of the passage of time; the agency is "not arguing, and has never argued, that a court should never consider the passage of time in determining whether a document is protected by Exemption 5," Appellee's Br. 19, and it has identified the draft of Volume V as "represent[ing] the view of merely one staff historian," Robarge Decl. ¶ 12, expressed thirty years ago about events that occurred over fifty years ago. Thereafter, as necessary, the district court should address the applicability of Exemptions 1 and 3 also invoked by the agency. I respectfully dissent.