**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 7, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JESSE C. TRENTADUE,

     Plaintiff - Appellant,

v.

INTEGRITY COMMITTEE, a
subdivision of the President's Council
on Integrity and Efficiency,

     Defendant - Appellee.[1]

Nos. 04-4200 & 06-4129

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:03-CV-339-TS)**

---

Jesse C. Trentadue, Salt Lake City, Utah, Pro Se for Plaintiff - Appellant.

Peter R. Maier, Appellate Staff Civil Division (Peter D. Keisler, Assistant
Attorney General, Paul M. Warner, United States Attorney, and Leonard
Schaitman, Appellate Staff Civil Division with him on the briefs), Department of
Justice, Washington, D.C. for Defendant - Appellee.

---

Before **KELLY**, **HENRY**, and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

[1] This suit originally named the President's Council on Integrity and
Efficiency ("PCIE") as a defendant in addition to the Integrity Committee ("IC").
Because PCIE was dismissed from this suit, we have amended the caption to list
only the IC as defendant–appellee.

Jesse Trentadue appeals a district court's order rejecting his Freedom of Information Act ("FOIA") and constitutional claims to certain documents in the possession of the IC, and denying his motion for additional findings of fact. We conclude that, although some severable portions of the documents at issue may be withheld under FOIA's exemptions, most of the material falls outside the exemptions and must be disclosed. Accordingly, we **REVERSE IN PART** and **REMAND** to the district court for further proceedings consistent with this opinion.

## I

In the early morning hours of August 21, 1995, staff at the Federal Transfer Center in Oklahoma City, Oklahoma found the bloody body of Kenneth Michael Trentadue hanging in his cell. We need not repeat here the grisly details of that death, which are discussed fully in Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 847-49 (10th Cir. 2005). The Bureau of Prisons ("BOP") initially investigated Trentadue's death, but ceased soon after the Federal Bureau of Investigation ("FBI") opened its own criminal inquiry. After the Trentadue family expressed concern over the FBI's conduct, the Civil Rights Division of the U.S. Department of Justice ("DOJ") began overseeing the investigation. Following lengthy grand jury proceedings, the DOJ concluded no credible evidence supported the theory that Trentadue was murdered. The DOJ Office of

the Inspector General ("OIG") subsequently reviewed that investigation, finding that Trentadue had committed suicide, but also disclosing a number of "serious deficiencies." Id. at 850. The Oklahoma City Police Department also looked into Trentadue's death, and it too concluded he committed suicide.

Nevertheless, the Trentadue family remains convinced that Kenneth was murdered by either prison staff or other prisoners. After a summary of the sealed OIG report was released to the public, Jesse Trentadue, Kenneth's brother, filed an administrative complaint with the IC, a committee of PCIE, alleging misconduct by DOJ Inspector General ("IG") Glen Fine and his staff.

PCIE is an interagency, executive branch body created to "identify, review, and discuss areas of weakness and vulnerability in Federal programs and operations to fraud, waste, and abuse, and [to] develop plans for coordinated, Governmentwide activities that address these problems and promote economy and efficiency in Federal programs and operations." Exec. Order No. 12,805 § 3(a), 57 Fed. Reg. 20,627 (May 14, 1992). In conjunction with the Executive Council on Integrity and Efficiency, the chairperson of PCIE created the IC, which was later empowered to "receive, review, and refer for investigation allegations of wrongdoing against IGs and certain staff members of the OIGs." Exec. Order No. 12,993 § 1(a), 61 Fed. Reg. 13,043 (Mar. 21, 1996). Upon receiving an allegation, the IC determines whether there is a "substantial likelihood" of wrongdoing. Id. § 2(c). If so, it refers the allegation to the appropriate authority

- 3 -

or investigates the matter itself. Id. The investigative body then submits a report to the IC, which must decide to either forward the report to the chairperson of PCIE with a recommendation, or take no further action. Id. § 4(a)-(c). Executive Order 12,993 concludes by noting that it is "intended only to improve the internal management of the executive branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person." Id. § 7.

Trentadue's allegations were assigned Case Number 349 by the IC and referred to the DOJ Public Integrity Section to determine whether a criminal investigation was appropriate. Although the DOJ decided not to pursue criminal charges, the IC requested a response to Trentadue's allegations from Fine. He complied in September 2002. Trentadue subsequently requested to view any documents submitted by Fine, but the IC did not disclose Fine's response. On November 26, 2002, the IC sent Trentadue a letter stating it would take no further action with respect to his allegations. Trentadue, however, apparently did not receive that letter and inquired as to the status of the IC's investigation in February 2003. The IC then resent the November 26 letter indicating its investigation was closed.

Upon learning that the IC intended to take no action, Trentadue filed a FOIA request, seeking: (1) any IC reports or rulings issued in Case Number 349, (2) copies of all documents submitted by the DOJ or OIG to the IC, (3) copies of

all documents sent from the IC or PCIE to the DOJ or OIG, and (4) any record indicating that the IC actually mailed the November 26 letter on November 26. In response, the IC conducted a review of its records and concluded that Trentadue was already in possession of two responsive documents: the November 26, 2002 letter, and a redacted version of OIG's November 1999 report regarding the investigation of Kenneth's death. Relying on the FOIA exemptions codified at 5 U.S.C. § 552(b)(5), (6), and (7)(C), however, the IC withheld 94 pages of responsive documents.

In April 2003, Trentadue filed a complaint in federal district court against the IC and PCIE. Trentadue subsequently moved to dismiss his claims against PCIE, and the dispute narrowed to two records: the set of documents submitted by Fine to the IC, and an IC scheduling notice. Trentadue asserted claims to these records under FOIA, as well as the First and Fifth Amendments.

Both parties filed cross motions for summary judgment, with the IC arguing that the documents were properly withheld under FOIA exemptions 5, 6, 7(A), and 7(C). In support of its motion, the IC submitted a sworn declaration from Noel Hillman, Chief of DOJ's Public Integrity Section, who averred that release of the contested materials "would interfere with the Public Integrity Section's ongoing, related criminal investigation." After an in camera review of the records, the district court granted the IC's motion for summary judgment with respect to Fine's submissions to the IC. The court concluded that the documents

were properly withheld under § 552(b)(7)(A), because their disclosure "could reasonably be expected to interfere with enforcement proceedings." It also granted summary judgment to Trentadue on his claim for release of the scheduling notice. Finally, the court dismissed Trentadue's constitutional cause of action for failure to state a claim. Trentadue then filed a motion for additional findings and amendment of judgment, which the district court denied.

Trentadue appealed the district court's adverse rulings under docket number 04-4200 in this court. While his appeal was pending, the IC released two additional documents to Trentadue. The first is a one-page cover letter accompanying a substitute page submitted by Fine to the IC. The second is an attachment to Fine's substantive comments, consisting solely of a district court order in Estate of Kenneth Michael Trentadue v. United States, No. CIV-97-849-L (W.D. Okla. May 1, 2001).[2]

While his appeal was pending, Trentadue pursued a separate FOIA case in federal court. Hillman submitted a similar declaration in that case, claiming that release of the information sought by Trentadue would compromise an ongoing investigation. The district court, however, noted a "conflict in the record as to whether there is in fact an ongoing investigation being conducted by the Public

---

[2] Although the issue is no longer before us in the present appeal, we are perplexed that the district court, after an in camera review, held that the release of this public court record "could reasonably be expected to interfere with enforcement proceedings."

Integrity Section." Trentadue v. Fed. Transfer Ctr., No. 2:03-CV-00946, slip op. at 2 (D. Utah May 23, 2005). It ordered Hillman to appear before the court to testify, in camera if necessary, as to the status of the investigation. Id. Hillman then submitted an additional declaration stating that the Public Integrity Section had closed its investigation. Following this declaration, the IC filed a motion for partial vacatur and remand with this court, noting that with the conclusion of the Public Integrity Section's investigation, § 552(b)(7)(A) no longer justified withholding the documents at issue. We granted that motion, vacating the district court's grant of summary judgment to the IC and remanding to determine whether one of the other FOIA exemptions asserted by the IC justified withholding. See Trentadue v. Integrity Comm., No. 04-4200 (10th Cir. Sept. 27, 2005).

On remand, the parties filed supplemental briefs concerning the applicability of § 552(b)(5), (6), and (7)(C). In support of its arguments, the IC submitted a declaration from William Gressman, a Senior Associate General Counsel with the U.S. Office of Government Ethics. Gressman stated, "Protection of IG Fine's submission specifically and IG responses generally is necessary to ensure free, open, and candid discussion between the IC and subject IG." The district court was persuaded by this declaration and found that § 552(b)(5) allowed the IC to withhold each of the disputed documents in their entirety. It further found that § 552(b)(6) and (7)(C) justified withholding information identifying law enforcement personnel, including those accused of

- 7 -

misconduct, as well as information identifying third parties with no connection to law enforcement.

Trentadue again appealed and was assigned a second docket number, 06-4129. This court later consolidated his two appeals. See Trentadue v. Integrity Comm., Nos. 04-4200 & 06-4129 (10th Cir. June 1, 2006).

## II

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance; And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." James Madison, Letter to W.T. Barry (Aug. 4, 1822), reprinted in The Complete Madison, 337 (Saul K. Padover ed., 1953). Heeding the wisdom of Madison's words, Congress passed FOIA in 1966, to provide a public right of access, enforceable in federal court, to agency records. See 5 U.S.C. § 552. The purpose of the Act "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978); see also 110 Cong. Rec. 17,087 (1964) (statement of Sen. Edward V. Long) ("A government by secrecy benefits no one. It injures the people it seeks to serve; it damages its own integrity and operation. It breeds distrust, dampens the fervor of its citizens and mocks their loyalty.").

Notwithstanding FOIA's aspiration of governmental transparency, Congress recognized that disclosure of certain classes of documents could harm legitimate government interests.  See Casad v. U.S. Dep't of Health & Human Servs., 301 F.3d 1247, 1250-51 (10th Cir. 2002).  Thus Congress created nine specific exemptions allowing agencies to withhold otherwise responsive documents.  5 U.S.C. § 552(b).  The following four exemptions are relevant to this appeal:

> This section does not apply to matters that are –
> . . .
> (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
> (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
> (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, . . . [or] (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . .

Id.

In considering whether information should be disclosed, two guiding principles apply.  First, FOIA is to be broadly construed in favor of disclosure.  Alirez v. NLRB, 676 F.2d 423, 425 (10th Cir. 1982).  Second, its exemptions are to be narrowly circumscribed.  Irons & Sears v. Dann, 606 F.2d 1215, 1219 (D.C. Cir. 1979).  FOIA further provides that "[a]ny reasonably, segregable portion of a record shall be provided to any person requesting such record after deletion of the

portions which are exempt." § 552(b). The federal agency resisting disclosure bears the burden of justifying withholding. Alirez, 676 F.2d at 425.

Whether a FOIA exemption justifies withholding a record is a question of law that we review de novo. Casad, 301 F.3d at 1251. Because this appeal arises from a grant of summary judgment in favor of the IC, we review the record and all reasonable inferences to be drawn therefrom in the light most favorable to Trentadue. Hale v. U.S. Dep't of Justice, 226 F.3d 1200, 1203 (10th Cir. 2000).

## A

Exemption 5 excuses disclosure of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." § 552(b)(5). In other words, it protects documents that would be covered by any privilege that an agency could assert in a civil proceeding. One such privilege is the deliberative process privilege, which shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." Dep't of the Interior v. Klammath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Id. at 8-9 (quotations and

citations omitted).  It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action."  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  However, consistent with FOIA's general policy of broad disclosure, Exemption 5 is to be construed "as narrowly as consistent with efficient Government operation."  S. Rep. No. 89-813, at 9 (1965).

Courts have struggled to precisely delineate the scope of Exemption 5, but two requirements are clear:  Privileged documents must be both predecisional and deliberative.  See Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir. 1993).  As to the first criterion, we must distinguish between "predecisional memoranda prepared in order to assist an agency decisionmaker in arriving at his decision, which are exempt from disclosure, and postdecisional memoranda setting forth the reasons for an agency decision already made, which are not." Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975).

The second prong, whether a document is "deliberative," has proven more difficult to cabin.  See Coastal States Gas, 617 F.2d at 867 ("The cases in this area are of limited help to us, because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.").  In EPA v. Mink, 410 U.S. 73 (1973), the Court distinguished between

deliberative and factual materials: "Exemption 5 . . . requires different treatment for material reflecting deliberative or policy-making processes on the one hand, and purely factual, investigative matters on the other." Id. at 89. It held that Exemption 5 does not protect "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context." Id. at 87-88. Consistent with FOIA's general severability requirement, see 5 U.S.C. § 552(b), factual materials are generally not privileged unless they are "inextricably intertwined with policy-making processes." Nat'l Wildlife Fed'n v. U.S. Forest Serv., 861 F.2d 1114, 1119 (9th Cir. 1988). Non-factual materials that express opinions or recommendations, on the other hand, are clearly protected. See, e.g., NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) ("The cases . . . focus on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.") (citation and quotation omitted); Coastal States Gas, 617 F.2d at 866 ("The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.").

Following the Court's exhortation to apply a "flexible, commonsense approach" to factual/deliberative classifications, Mink, 410 U.S. at 91, it has been noted that "courts must be careful not to become victims of their own semantics,"

- 12 -

Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 256 (D.C. Cir. 1977).  Reasoning that Exemption 5 "is intended to protect the deliberative process of government and not just deliberative material," the Mead Data court held that "[i]n some circumstances . . . the disclosure of even purely factual material may so expose the deliberative process within an agency that it must be deemed exempted."  Id.

Taking that approach even further, the Ninth Circuit has adopted a "process-oriented" or "functional" test that exempts "[f]actual materials . . . to the extent that they reveal the mental processes of decisionmakers."  Nat'l Wildlife Fed'n, 861 F.2d at 1119.  Thus, "whenever the unveiling of factual materials would be tantamount to the 'publication of the evaluation and analysis of the multitudinous facts' conducted by the agency, the deliberative process privilege applies."  Id. (quoting Montrose Chem. Corp. of Cal. v. Train, 491 F.2d 63, 68 (D.C. Cir. 1974)).  By contrast, the Eleventh Circuit has explicitly rejected that approach, holding instead that "[t]he fact/opinion distinction continues to be an efficient and workable standard for separating out what is, and what is not, deliberative."  Fla. House of Representatives v. U.S. Dep't of Commerce, 961 F.2d 941, 949 (11th Cir. 1992).

The IC argues that factual material should be protected whenever it would "expose the deliberative process," citing Wolfe v. Department of Health & Human Services, 839 F.2d 768, 774 (D.C. Cir. 1988) (en banc).  However, information is

not protected simply because disclosure would reveal some minor or obvious detail of an agency's decisionmaking process. Were that the test, Exemption 5 would swallow FOIA entirely. It is difficult to imagine a document that would not divulge some tidbit regarding an agency's deliberative process. Moreover, the IC's overly broad reading is contrary to our duty to construe FOIA's exemptions narrowly. See Irons & Sears, 606 F.2d at 1219.

Consistent with our sister circuits, we hold that factual information may be protected under Exemption 5 under certain narrow circumstances: when disclosure would "so expose the deliberative process within an agency that it must be deemed exempted." Mead Data, 566 F.2d at 256 (emphasis added); see also Nat'l Wildlife Fed'n, 861 F.2d at 1119 (applying Exemption 5 to factual materials when disclosure "would be tantamount to the publication of the [agency's] evaluation and analysis") (quotation omitted). But see Fla. House of Representatives, 961 F.2d at 949.

Looking to the cases the IC cites in support of its reading only bolsters a narrower view of Exemption 5. In Wolfe, plaintiffs sought a "Regulation Log" used by the Department of Health and Human Services to internally track the status of certain regulatory actions. 838 F.2d at 771. Although the information contained in the log was purely factual, showing the dates of transmittal from one agency to another, such information had the effect of revealing the recommendations of each agency:

> [I]f the information requested is made public and shows a transmittal from the [Food and Drug Administration ("FDA")] to [the Department of Health and Human Services], it is known that the FDA has proposed to regulate a particular subject, and if no transmittal is shown, it is known that the FDA has decided not to recommend such regulation or not to recommend it yet.

Id. In other words, the fact that a transmittal had occurred was "the functional equivalent of an intra-agency or inter-agency memorandum that states, 'We recommend that a regulation on this [named] subject matter be promulgated.'" Id. at 774. Because such a recommendation is undeniably protected by Exemption 5, the court sensibly extended that protection to the nominally factual, but operatively deliberative, transmittals.

Similarly, in National Wildlife Federation, the plaintiff requested working drafts of a National Forest Plan and the environmental impact statements associated with it. 861 F.2d at 1115. The district court noted that plaintiffs could simply compare the contested draft documents prepared by lower-level Forest Service personnel to the final documents adopted by the agency in order to "reconstruct the predecisional judgments of the administrator." Id. at 1122. Again, the release of such purely factual material would have had the effect of disclosing deliberative material.

Montrose Chemical Corp. follows the same logic. In that case, plaintiff sought staff memos summarizing the evidence presented at an EPA hearing on the pesticide DDT. 491 F.2d at 64. The full record of that hearing, spanning some

9200 pages, was already publicly available. Id. at 70. Accordingly, "[t]he only new information which disclosure of these summaries would provide Montrose concerns the mental processes of the agency." Id. at 68 (quotation marks omitted). The court held that the disputed materials were shielded by Exemption 5 because disclosure would reveal "what advice as to importance and unimportance of facts the Administrator received, and how much of it he accepted." Id. at 70. That holding explicitly rested on the public's ability to compare the summaries with the record as a whole. See id. at 71 ("Where the factual material is not already in the public domain, a different result might be reached.").

These cases have carved out a limited exception to the general rule that factual materials are not privileged under Exemption 5. However, that exception is limited to situations in which disclosure of factual content would reveal deliberative information by allowing the public to easily infer the latter from the former. We recognize that one D.C. Circuit case cited by the IC, Mapother, appears to take a more expansive view, and would "shelter factual summaries that were written to assist the making of a discretionary decision," at least where "the selection of the facts thought to be relevant clearly involves the formulation or exercise of . . . policy-oriented judgment or the process by which policy is formulated." 3 F.3d at 1539 (quotations and citation omitted). To the extent that Mapother allows an agency to withhold factual material simply because it reflects

a choice as to which facts to include in a document, we reject that approach. As

an earlier D.C. Circuit case persuasively noted:

> Anyone making a report must of necessity select the facts to be
> mentioned in it; but a report does not become a part of the
> deliberative process merely because it contains only those facts
> which the person making the report thinks material. If this were not
> so, every factual report would be protected as a part of the
> deliberative process.

Playboy Enters., Inc. v. Dep't of Justice, 677 F.2d 931, 935 (D.C. Cir. 1982); see

also Nat'l Wildlife Fed'n, 861 F.2d at 1119. Moreover, the Mapother approach,

which would result in the protection of much (if not most) factual material, runs

contrary to Mink's clear approval of the factual/deliberative distinction. 410 U.S.

at 89 ("Exemption 5 . . . requires different treatment for material reflecting

deliberative or policy-making processes on the one hand, and purely factual,

investigative matters on the other.").

To summarize, we hold that factual materials are not privileged under

Exemption 5 unless: (1) they are inextricably intertwined with deliberative

materials, Nat'l Wildlife Fed'n, 861 F.2d at 1119, or (2) their disclosure would

reveal deliberative material, as contemplated in National Wildlife Federation, 861

F.2d at 1122, Wolfe, 838 F.2d at 774, and Montrose Chemical Corp. 491 F.2d at

at 68. These limited exceptions to the general rule that factual material is not

privileged comport with Congress' demand that we construe Exemption 5 "as

narrowly as consistent with efficient Government operation." S. Rep. No. 89-813, at 9.

We turn now to the documents implicated in the present case.

**1**

Two of the documents at issue are essentially the same record. The first is a cover letter from Fine to the IC, and the second is a replacement page submitted by Fine to correct a scrivener's error in the initial letter. The IC has already disclosed the first paragraph and the first line of the second paragraph of the cover letter, but has withheld the remainder based on Exemption 5.

Much of the withheld portion is Fine's opinion regarding the proper scope of IC authority. As such, it clearly falls within the deliberative process privilege as "reflecting advisory opinions, recommendations and deliberations." Sears, Roebuck & Co., 421 U.S. at 150 (citation and quotation omitted).

However, a significant portion of the letter—almost all of page two—does not reflect Fine's opinions at all; it merely states historical facts about the OIG's investigation into Kenneth's death.[3] This portion of the letter is not inextricably intertwined with exempt material—the two or three sentences in which Fine

_____

[3] This material includes the identities of various officials and their roles in drafting the OIG report on the DOJ's investigation into Kenneth's death. However, unlike its arguments regarding Fine's substantive response, the IC does not contend that § 552(b)(6) or (7)(C) justify withholding such information. Accordingly, we do not consider whether withholding would be permissible under these alternative exemptions.

- 18 -

expresses an opinion are easily severed and would not shed any light on Fine's unrelated factual statements. Nor would disclosing this purely factual information expose the deliberative process in any meaningful way.

A third class of information included in the letter lists the individuals involved in preparing the OIG's response to the IC. It comprises the paragraph spanning pages one and two. Again, this material is not inextricably intertwined with deliberative material; the final sentence expresses Fine's opinion, but the remainder contains only facts. Also like the prior material, disclosure of these facts would not expose the deliberative process under any reasonable definition of that term. Accordingly, this third class of information is not protected by Exemption 5.

**2**

The final document remaining in dispute, and by far the largest, is Fine's substantive response to the IC. With respect to this document, the district court held:

> The Court rejects the contention that the Court should attempt to segregate materials from within the document that may be considered "deliberative" from those which are not, such as statements of fact. The Court believes that if the author of a document knows that parts of the document may or may not be disclosed to the public depending on how the author parses his words, that it would undermine the quality of the author's response and would frustrate the purpose behind exemption 5. Even if this approach is legally incorrect, the Court finds that in this case it cannot segregate the "factual" from the "deliberative" materials . . . because they are inextricably intertwined.

The district court's statement cannot be squared with the clear edict of § 552(b), which mandates that "[a]ny reasonably, segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." The court's concern that authors may parse their language out of fear of disclosure is misguided. Whether a portion of a document is deliberative is an objective question, and it is the duty of courts to answer that question. The manner in which an author organizes her thoughts may make that duty more or less difficult, but the solution is not to simply abdicate and allow withholding en masse. Policy considerations are not a license to rewrite FOIA; rejecting the factual/deliberative distinction in favor of an approach focused solely on policy would belie Congressional intent and run afoul of clear Supreme Court precedent. See Mink, 410 U.S. at 89. The district court thus erred in refusing to conduct a severability analysis.

The court provided an alternative basis for its ruling, ostensibly finding that every factual statement in Fine's response was "inextricably intertwined" with deliberative material. The IC urges us to review this finding for clear error, citing Willamette Industries, Inc. v. United States, 689 F.2d 865, 868 (9th Cir. 1982). It is unclear to us whether we should review the severability issue, a mixed question of law and fact, for clear error or de novo. See Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 850 (10th Cir. 1986) (holding a mixed question of law and fact is present when "the issue is only whether the facts must meet the statutory

- 20 -

standard. If what must be decided in the mixed question involves primarily a consideration of legal principles, then the appellate court reviews de novo."). We need not rule on the issue, however, because we conclude that the district court erred even under the more deferential clear error standard.

The introduction to Fine's response, covering the first seven pages of the document, is almost entirely unprotected. These pages provide general background information on Kenneth's death and the subsequent investigations and lawsuits, generally expanding on the summary provided on page two of Fine's cover letter. Like that summary, disclosing this purely factual content would not reveal any deliberative material by inference.

One section of the introduction is exempt, but it is readily severable from the remainder. On page four, the report discusses the OIG's recommended course of action with respect to several individuals who were accused of misconduct. This material is clearly deliberative, as it states the opinion of the OIG as transmitted to the ultimate decisionmakers. It is predecisional, in that it was "prepared in order to assist an agency decisionmaker in arriving at his decision," rather than "setting forth the reasons for an agency decision already made." Grumman Aircraft Eng'g Corp., 421 U.S. at 184. The fact that this predecisional recommendation is reported here, many years after the ultimate decisions were made, does not alter our conclusion; we look to whether a recommendation was made prior to a final decision, not to the date of subsequent reports that mention

it. Discussions of these OIG recommendations are accordingly protected, and must be severed from the surrounding non-exempt material.

On page eight, the response shifts into a discussion of the OIG's opinion regarding the proper scope of IC inquiries.[4] Like similar material in his cover letter, these inter-agency recommendations fall under the protection of Exemption 5. The full section, which continues to page ten, was properly withheld.

Finally, we come to Fine's substantive responses to Trentadue's allegations. The IC characterizes these pages as "Fine's own opinions and positions and those of his staff." We disagree with its assessment. Having reviewed the material, it is clear that it, too, is largely factual, though a small amount of deliberative material is sprinkled throughout. Those portions may be withheld, but they are readily severable.

As discussed above, see supra Part II.A, factual materials do not become privileged merely because they represent a summary of a larger body of information. See Nat'l Wildlife Fed'n, 861 F.2d at 1119; Playboy Enters., Inc., 677 F.2d at 935. In this document, Fine responds to a set of discrete allegations made by Trentadue. His factual responses do not shed light on any internal deliberations. Without a final report from the IC, there is no way to discern how

_____

[4] This page includes the latter portion of Fine's "roadmap" section, which lays out a brief outline of the document's body.

Fine's responses were incorporated into the actual deliberations.[5] Nor do the IC's particular phrasing and ordering of most of Trentadue's allegations reveal deliberative information. Had the IC selected certain allegations for response and dismissed others, this might not be the case. See Mapother, 3 F.3d at 1539-40 (distinguishing, even under a broader reading of Exemption 5, between summaries "assembled through an exercise of judgment" and a "comprehensive collection of the essential facts" in which "no known datum in the selected categories has been omitted"). However, a comparison of Trentadue's allegations with Fine's response reveals that they differ minimally.

There exist, however, two allegations that do not derive from Trentadue's complaint. They are found in Sections 15 and 16 of Fine's response. It is unclear from the record before us whether Trentadue advanced these claims in some separate correspondence with the IC, or if they came from the IC itself. Because Trentadue has failed to include in the record the documents from which the allegations in Sections 15 and 16 derive, he has not carried his burden to provide a sufficient appellate record on this point, and we must affirm the district court's holding that these Sections are protected. See Scott v. Hern, 216 F.3d 897, 912 (10th Cir. 2000).

_____

[5] We note that Fine was outside of the decisionmaking process; as the subject of the IC's investigation he was not privy to its deliberations. See Casad, 301 F.3d at 1252 (noting that "the nature of the decisionmaking authority vested in the officer or person issuing the disputed document" is helpful in determining whether Exemption 5 is applicable) (quotation omitted).

The severable, deliberative portions of Fine's substantive responses are for the most part comprised of inter-agency recommendations made during the various investigations into Kenneth's death. Like the material on page four, they are both predecisional and deliberative. Information of this sort appears: at the close of Section 1, at the close of Section 3, in footnote 7, at the beginning of Section 8, at the close of Section 8, throughout most of Sections 9 and 10, and in footnote 20. In addition, the document includes a smattering of recommendations made by Fine to the IC. These statements, which consist of mere single sentences, may also be withheld. They are found: in footnote 8, at the close of Section 6, at the close of Section 14, and throughout the Conclusion. The remainder of the document is not protected by Exemption 5.

**B**

Exemption 6 of FOIA excuses disclosure of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" refers broadly to "detailed Government records on an individual which can be identified as applying to that individual." U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982) (quotation omitted); see also Forest Guardians v. FEMA, 410 F.3d 1214, 1217 (10th Cir. 2005) (holding that "similar files" has a "broad, rather than a narrow, meaning and encompasses all information that applies to a particular individual") (quotation omitted).

In determining whether the release of such information would "constitute a clearly unwarranted invasion of personal privacy," we must balance "the public interest in disclosure against the privacy interest Congress intended the exemption to protect." Id. at 1217-18 (quotation and alteration omitted). We must assess the extent to which disclosure would contribute to the "public understanding of the operations or activities of the government," not the interests of the requesting party. U.S. Dep't of Def., 510 U.S. at 495 (quotation omitted). "Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose"; however, that purpose "is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 773 (1989).

As noted above, the district court held that three types of information were protected under Exemption 6, those relating to: law enforcement personnel accused of misconduct, law enforcement personnel not accused of misconduct, and individuals unrelated to law enforcement but tangentially mentioned in Fine's response. On appeal, Trentadue has expressly disclaimed any interest in the latter

two categories.[6] Thus the only material in dispute is that which identifies law enforcement personnel accused of misconduct.

The IC argues that individuals accused of misconduct have a significant privacy interest in their identities, but much of the authority it cites is unhelpful because it concerns private citizens, rather than government employees. See, e.g., Neely v. FBI, 208 F.3d 461, 464-65 (4th Cir. 2000) (criminal suspects); Computer Profs. for Soc. Responsibility v. U.S. Secret Serv., 72 F.3d 897, 904 (D.C. Cir. 1996) (potential suspects). Obviously, information regarding private citizens will contribute far less to "public understanding of the operations or activities of the government," U.S. Dep't of Def., 510 U.S. at 495-96, than would information about public employees.

Most of the other cases cited by the IC deal with Exemption 7(C), which, as discussed in Part II.C infra, is more protective than Exemption 6. See, e.g., Massey v. FBI, 3 F.3d 620, 624 (2d Cir. 1993); Stern v. FBI, 737 F.2d 84, 92-94 (D.C. Cir. 1984). However, this latter category of cases does inform our judgment as to the various interests in play. In analyzing Exemption 7(C), our Circuit has previously held that "law enforcement officials have a substantial privacy interest in concealing their identity." Hale v. U.S. Dep't of Justice, 973 F.2d 894, 902 (10th Cir. 1992) (vacated on other grounds).

---

[6] As Trentadue has relinquished his interest in these two categories of information, the IC may appropriately refrain from disclosing it to him as outside the scope of his request. We reach no decision on the merits in this respect.

As to the public interest in the information at issue here, we agree with the D.C. Circuit that the relevant interest is "only in knowing <u>who</u> the public servants are that were involved in the governmental wrongdoing." <u>Stern</u>, 737 F.2d at 92. Because Exemption 6 protects only identifying information, an agency must still disclose the fact that somebody was accused of misconduct and what steps, if any, were subsequently taken. Thus disclosure of information protected by Exemption 6 would shed little light on the conduct of the agency; rather, it would simply identify the alleged wrongdoer. Undoubtedly, there is a strong public interest in "monitoring the conduct and actual performance of public officials." <u>Baez v. U.S. Dep't of Justice</u>, 647 F.2d 1328, 1339 (D.C. Cir. 1980). Two factors affect the weight of that interest: "the level of responsibility held by a federal employee, as well as the activity for which such an employee has been censured." <u>Stern</u>, 737 F.2d at 92. The public interest in learning of a government employee's misconduct increases as one moves up an agency's hierarchical ladder.

Turning to the information withheld in the present case, we conclude that the identities of the individuals discussed on page four are protected by Exemption 6. Each of these individuals was a low-level employee who committed serious acts of misconduct. The public interest in learning how law enforcement agencies dealt with these individuals is very high, and that information must be released. Disclosing the names of the employees, however,

would shed little light on the operation of government.  Identifying information with respect to these individuals may be properly withheld under Exemption 6.[7]

The IC also seeks to withhold significant portions of Fine's response under Exemption 6 because those portions answer Trentadue's allegations with respect to specific individuals.  Their reliance on Exemption 6 is misplaced.  In the complaint Trentadue filed with the IC, a public document included in the record of this appeal, he accused a number of individuals of wrongdoing.  Fine's response to these accusations, by necessity, mentions the names of these individuals.  Disclosure of these names, when the allegations made against the individuals are already part of the public record, would not invade the accused's privacy at all, much less constitute a "clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Consistent with our duty to construe FOIA's exemptions narrowly, Irons & Sears, 606 F.2d at 1219, we conclude that these portions are not protected by Exemption 6.  Such information appears in Sections 1-12.

**C**

---

[7] The IC's notations regarding this protected information indicate that they intend to redact large portions of the document.  The only personal information contained in the documents are the names of the individuals.  Our holding that the personal information of these individuals may be protected is thus limited to those names.  It should not be read as an endorsement of the IC's approach, in which entire pages would be protected to hide a handful of first and last names.  We expressly reject their current redactions as vastly overbroad.

Exemption 7(C) of FOIA closely tracks Exemption 6; it excuses disclosure of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7). The district court held that portions of Fine's substantive response that identified individuals accused of misconduct were protected from disclosure under this exemption.

Exemption 7(C) is similar to, but more protective of privacy than, Exemption 6. See Reporters Comm., 489 U.S. at 756. The former allows withholding of information that "could reasonably be expected to constitute" an "unwarranted" invasion of privacy, while the latter is limited to disclosures that "would constitute" an invasion of privacy that is "clearly unwarranted." See U.S. Dep't of Def. v. Fed. Labor Relations Auth., 510 U.S. 487, 496 n.6 (1994). Additionally, for Exemption 7(C) to apply, we must make a threshold determination that the records for which the IC seeks protection were "compiled for law enforcement purposes." The IC urges us to adopt a per se rule that documents compiled by law enforcement agencies "are inherently records compiled for 'law enforcement purposes' within the meaning of Exemption 7." Curran v. Dep't of Justice, 813 F.2d 473, 475 (1st Cir. 1987). Because we harbor significant doubts as to whether the IC is a law enforcement agency, we decline to espouse such a rule.

- 29 -

Unlike a quintessential law enforcement agency that possesses an express mandate to enforce the law, such as the Federal Bureau of Investigation, cf. Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 32 (D.C. Cir. 1998), the IC is "intended only to improve the internal management of the executive branch." Exec. Order No. 12,993 § 7, 61 Fed. Reg. 13,043 (March 21, 1996) (emphasis added). Thus, although a portion of the IC's authority is to "determine if there is a substantial likelihood that [an] allegation . . . discloses a violation of any law, rule or regulation," its principal responsibility is limited to "refer[ring] the allegation to the agency of the executive branch with appropriate jurisdiction over the matter." Id. § 2(c). Only in those rare cases where "a potentially meritorious administrative allegation cannot be referred to an agency of the executive branch with appropriate jurisdiction over the matter" can the Chair of the IC "cause a thorough and timely investigation of the allegation to be conducted." Id.

We are not faced with such a rare case. Rather, these records were compiled by Fine and his staff to assist the IC in complying with its duty to "receive, review, and refer for investigation allegations of wrongdoing against IGs and certain staff members of the OIGs." Id. § 1(a). Thus, even if the IC had discovered criminal activity in reviewing these allegations, it would have had no authority to enforce any sanction. It would have been limited to merely referring its results for investigation. And it is therein that our doubts about the status of

the IC arise.[8]  Despite our misgivings, however, we conclude that it is unnecessary to resolve whether the records at issue were compiled for reasons of law enforcement.  Assuming, without deciding, that they were so compiled, we hold that the relevant public interest outweighs any privacy concerns with respect to the bulk of this information and that it must therefore be disclosed.

Like Exemption 6, under Exemption 7(C) we balance the public's interest in obtaining "[o]fficial information that sheds light on an agency's performance of its statutory duties" against an individual's interest in maintaining privacy. Reporters Comm., 489 U.S. at 773.  Disclosure is in the public interest when it is "likely to contribute significantly to public understanding of the operations or activities of the government."  Id. at 775.  The privacy interest protected encompasses "the individual's control of information concerning his or her

---

[8] We recognize that some of our sister circuits have concluded that records collected by IGs in the ordinary course of their duties are records compiled for law enforcement purposes within the meaning of Exemption 7(C).  See, e.g., Ortiz v. U.S. Dep't of Health & Human Servs., 70 F.3d 729, 732-33 (2d Cir. 1995) ("An Inspector General of a federal government agency engages in law enforcement activities within the meaning of FOIA."); Brant Const. Co. v. EPA, 778 F.2d 1258, 1265 (7th Cir. 1985) (holding that letters sent to EPA OIG were records compiled for law enforcement purposes); New England Apple Council v. Donovan, 725 F.2d 139, 143 (1st Cir. 1984) ("The functions of OIG investigators are not so different from the functions of FBI agents as to warrant divergent treatment under FOIA exemption 7(C).").  This case is not one, however, in which Fine was compiling the records to fulfill his duties as IG.  The records at issue here were compiled by the IC for the singular purpose of addressing Trentadue's allegations against Fine.  Moreover, unlike typical Inspectors General, who have explicit enforcement and investigatory mandates, see Donovan, 725 F.2d at 143, the IC is limited to simply reviewing and referring for investigation, where necessary, the allegations that it receives.

person" and involves "restriction of information to the use of a particular person or group or class of persons." Id. at 763-64.

We have already concluded that any identifying information associated with the low-level employees mentioned on page four of Fine's response is protected by Exemption 6. It follows from that holding that this same information is also appropriately enveloped in the greater protection provided by Exemption 7(C). As to the remainder of Fine's response, which addresses law enforcement officials accused of misconduct who have already been publicly identified in Trentadue's original complaint and other public proceedings, we hold that, despite the greater degree of protection afforded by Exemption 7(C), disclosure of their names does not constitute an unwarranted invasion of personal privacy within the meaning of Exemption 7(C). On balance, the important public interest in understanding how the government responded to these serious allegations outweighs any privacy interest the law enforcement officials have in the repeated disclosure of their identities. Indeed, any interest they have in preventing the further disclosure of their names is minimal, if not entirely nonexistent. We emphasize that their identities have already been publicly revealed in connection with Trentadue's original allegations; there is no continuing need for the IC to huddle their names. Again, this information appears in Sections 1-12 of Fine's response.

**D**

Trentadue requests that we remand this case with instructions to immediately release the disputed documents.  However, we hold that some portions of these documents may be withheld.  Accordingly, we leave the decision on how to proceed following remand to the discretion of the district court, consistent with this opinion.

**III**

Trentadue also asserts a constitutional claim to the documents at issue.  He argues that the IC's failure to provide him with the requested documents violates his due process rights and his right of access to the courts.  Because the district court granted the IC's motion to dismiss this claim for failure to state a claim, we conduct de novo review.  Tri-Crown, Inc. v. Am. Fed. Savs. & Loan Ass'n, 908 F.2d 578, 582 (10th Cir. 1990).  We will affirm only if Trentadue's complaint, viewed in the light most favorable to him, lacks "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).

"The Due Process Clause guarantees due process only when a person is to be deprived of life, liberty, or property."  Chambers v. Colo. Dep't of Corrs., 205 F.3d 1237, 1242 (10th Cir. 2000).  Trentadue has not demonstrated a life, liberty, or property interest in the materials at issue.  He has a liberty interest in his First Amendment right to petition the government, but that right has not been violated.  He was allowed to petition the IC; the right to petition confers no attendant right

to a response from the government.  See Smith v. Ark. State Highway Employees, 441 U.S. 463, 465 (1979).

Trentadue also had no right to participate in the IC process more generally. When agencies conduct "nonadjucative, fact-finding investigations, rights such as apprisal, confrontation, and cross-examination generally do not obtain." Hannah v. Larche, 363 U.S. 420, 446 (1960).  Due Process rights are "not implicated under such circumstances because an administrative investigation adjudicates no legal rights." SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 742 (1984).  The IC is tasked with investigating Inspectors General to ensure the executive branch is operating with integrity.  Trentadue's life, liberty, and property could not be jeopardized by such investigation.

**IV**

Finally, Trentadue raises two meritless claims.  He first contends that the court's reliance on Exemption 7(A) in his original proceeding is not moot and should be considered by this court.  He is incorrect.  The portion of the original district court order ruling that exemption 7(A) applied to the contested documents was vacated.  See Trentadue v. Integrity Comm., No. 04-4200 (10th Cir. Sept. 27, 2005).  There is no longer an order discussing exemption 7(A) from which he could now appeal.

Trentadue also argues that the district court erred in denying his motion for additional findings of fact.  We review a district court's decision not to amend a

judgment for abuse of discretion. <u>Price v. Philpot</u>, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005). Trentadue filed a motion requesting the district court supplement its judgment with additional findings of fact under Fed. R. Civ. P. 52(b). That rule, however, applies only to cases in which a district court issues factual findings following a trial on the merits. <u>See</u> Fed. R. Civ. P. 52(a). This case was terminated on summary judgment. Trentadue offers no legal support for his position; accordingly, we conclude that the district court did not abuse its discretion. <u>See</u> <u>Gross v. Burggraf Constr. Co.</u>, 53 F.3d 1531, 1547 (10th Cir. 1995).

## V

The decision of the district court is **REVERSED IN PART**. We **REMAND** for further proceedings consistent with this opinion.