# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 21, 2011             Decided June 3, 2011

No. 10-5353

VERN MCKINLEY,
APPELLANT

v.

BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01263)

*Michael Bekesha* argued the cause for the appellant. *Paul J. Orfanedes* was on brief.

*Samantha L. Chaifetz*, Attorney, United States Department of Justice, argued the cause for the appellee. *Tony West*, Assistant Attorney General, *Beth S. Brinkmann*, Deputy Assistant Attorney General, *Mark B. Stern*, Attorney, *Katherine H. Wheatley*, Associate General Counsel, Board of Governors of the Federal Reserve System, and *Yvonne F. Mizusawa*, Senior Counsel, were on the brief. *R. Craig Lawrence*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON, GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In December 2008 Vern McKinley (McKinley) submitted a request pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to the Board of Governors of the Federal Reserve System (Board) seeking information related to the Board's March 14, 2008 decision to authorize the Federal Reserve Bank of New York (FRBNY) to provide a temporary loan to The Bear Stearns Companies Inc. (Bear Stearns) through an extension of credit to JPMorgan Chase & Co. (JP Morgan). The Board produced documents in response to McKinley's request but withheld others pursuant to FOIA Exemptions 4, 5, 6 and 8. McKinley filed suit in district court to compel disclosure of the withheld documents. He now appeals the district court's entry of summary judgment in favor of the Board.

I.

We begin with a brief overview of the Federal Reserve System before describing the events surrounding the Board's March 14, 2008 loan decision and McKinley's FOIA request.

A. Overview of Federal Reserve System

The Congress created the Federal Reserve System in 1913 to serve as the nation's central bank. It is not a single entity "but rather a composite of several parts, both public and private, organized on a regional basis with a central governmental supervisory authority." *Reuss v. Balles*, 584 F.2d 461, 462 (D.C. Cir. 1978). Two of the parts are relevant here—the Board and the Federal Reserve Banks (Reserve Banks). The Board, composed of seven members appointed by the President and confirmed by the Senate, is the central supervisory authority of the Federal Reserve System. 12 U.S.C. § 241. There are currently twelve Reserve Banks, each located and operating

within a specific region of the country.[1] A bank organized under the laws of any State or the District of Columbia may apply to the Board to join the Federal Reserve System. 12 U.S.C. § 321. On joining, the bank purchases stock of the Reserve Bank responsible for the region of the country where the bank is located and thereby becomes a member bank. *Id.* Additionally, all national banks, that is, banks chartered under the National Bank Act of 1864 (formerly Act of June 3, 1864, ch. 106, 13 Stat. 99) (codified as amended in scattered sections of 12 U.S.C.); *see Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 640 (D.C. Cir. 2000) ("The National Bank Act of 1864 . . . , as amended, provides for the chartering of national banks."), must join the Federal Reserve System by purchasing stock of the Reserve Bank located in its district. 12 U.S.C. § 222. The Reserve Banks, then, "are private corporations whose stock is owned by the member commercial banks within their districts." *Comm. for Monetary Reform v. Bd. of Governors of Fed. Reserve Sys.*, 766 F.2d 538, 540 (D.C. Cir. 1985). Accordingly, they have the power to make contracts, to sue and be sued, to appoint a president and vice presidents, to prescribe bylaws and to perform other acts consistent with a private corporation. 12 U.S.C. § 341.

Notwithstanding the foregoing powers, the Board exercises significant supervisory authority over the Reserve Banks. For example, the Board appoints three of the nine directors of each Reserve Bank, 12 U.S.C. § 302; the Board approves the compensation a Reserve Bank pays to its directors, *id.* § 307; the Board approves each Reserve Bank's selection of its president and first vice president, *id.* § 341; the Board can suspend or remove any officer or director of a Reserve Bank, *id.* § 248(f);

---

[1] The Board can readjust the federal reserve districts, subject to the requirement that there be at least eight and no more than twelve. 12 U.S.C. § 222.

and the Board can "examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and . . . require such statements and reports as it may deem necessary," *id.* § 248(a)(1). The Reserve Banks are authorized to lend money to member banks. *Id.* § 343. "In unusual and exigent circumstances, the [Board] . . . may authorize any Federal reserve bank" to lend money to a non-member institution. *Id.* § 343(A). Before doing so, however, the Reserve Bank must "obtain evidence that [the institution] is unable to secure adequate credit accommodations from other banking institutions." *Id.*

## B. Bear Stearns Financing and FOIA Request

In early March 2008 the Board became aware that Bear Stearns, an important participant in many financial markets, was experiencing severe liquidity problems and might soon declare bankruptcy. Stefansson Decl. ¶ 7.[2] Bear Stearns was a holding company comprised partly of registered broker-dealers and, as such, was regulated by the United States Securities and Exchange Commission (SEC), not the Board. Winter Decl. ¶¶ 10-11.[3] Moreover, because Bear Stearns was not a depository institution, it was ineligible to borrow through the Federal Reserve's regular short-term lending program. Stefansson Decl. ¶ 7. The tools with which the Board could respond to Bear Stearns's liquidity problems were accordingly limited. Believing that a Bear Stearns bankruptcy would have far-

---

[2] Coryann Stefansson is an Associate Director of the Board's Division of Banking Supervision and Regulation, a position she has held since May 2007. Previously she was an FRBNY Assistant Vice President in Bank Supervision and Regulation from 1998 until 2007. Stefansson Decl. ¶ 1.

[3] Margaret Winter is the FOIA and Privacy Act Officer of the United States Securities and Exchange Commission. Winter Decl. ¶ 1.

reaching and negative effects on financial markets, however, the Board and Reserve Bank staff surveyed those institutions subject to the Board's regulation to assess their exposure to Bear Stearns. *Id.* ¶ 8. In particular, they sought to ascertain the exposure of large complex banking organizations (LCBOs).[4] *Id.* On March 13, 2008 the SEC notified the Board and the FRBNY that Bear Stearns had inadequate resources to meet its obligations and planned to declare bankruptcy the following morning. *Id.* ¶ 7 The Board met the following day—March 14—and determined "that, given the fragile condition of the financial markets at the time, the prominent position of Bear Stearns in those markets, and the expected contagion that would result from the immediate failure of Bear Stearns, the best alternative available was to provide temporary emergency financing to Bear Stearns through an arrangement with JPMorgan Chase & Co." Thro Decl. Ex. A (minutes of Board 3/14/08 meeting).[5] The Board accordingly authorized the FRBNY to extend credit to JP Morgan to allow JP Morgan to provide a temporary loan to Bear Stearns. The FRBNY, in turn, approved the loan.[6] The loan allowed Bear Stearns to avoid

---

[4] "LCBOs are characterized by the scope and complexity of their domestic and international operations; their participation in large volume payment and settlement systems; the extent of their custody operations and fiduciary activities; and the complexity of their regulatory structure, both domestically and in foreign jurisdictions. To be designated as an LCBO, a bank holding company or foreign banking organization supervised by the Federal Reserve must meet specified criteria to be considered a significant participant in at least one critical or other key financial market." Stefansson Decl. ¶ 3.

[5] Alison Thro is "the most senior attorney in the Board's Legal Division responsible for reviewing FOIA requests." Thro Decl. ¶ 1.

[6] The FRBNY made the loan through JP Morgan because Bear Stearns was not a depository institution and therefore was not eligible

filing for bankruptcy but, on March 16, the Board and the FRBNY authorized a second loan to JP Morgan to facilitate JP Morgan's acquisition of Bear Stearns.

In December 2008 McKinley submitted to the Board a FOIA request for "further detail on information contained in the [March 14, 2008] minutes of the Board." Thro Decl. Ex. A (FOIA request). He specifically sought "any supporting memos or other information that detail the 'expected contagion that would result from the immediate failure of Bear Stearns' and the related conclusion that 'this action was necessary to prevent, correct, or mitigate serious harm to the economy or financial stability' as described in the meeting minutes." *Id.*

After having received no response from the Board by July 2009, McKinley filed a complaint in district court seeking a declaratory judgment that FOIA entitles him to disclosure of the information he requested and seeking disclosure of that information. Compl. ¶¶ 36-47. The Board then produced 120 pages of previously released or publicly available documents on August 11, 2009. *McKinley v. FDIC*, 744 F. Supp. 2d 128, 133 (D.D.C. 2010). On September 30, 2009 the Board produced an additional forty-eight pages in full and twenty-seven pages with information redacted. *Id.* It also identified and withheld 163 pages pursuant to FOIA Exemptions 4, 5, 6 and 8. *Id.* Eight of the 163 withheld pages originated with the SEC and the Board referred the disclosure determination regarding those documents

---

to receive funds directly from the FRBNY's discount window. Stefansson Decl. ¶ 7. "The Discount Window is the long-standing program through which the twelve Federal Reserve Banks make short-term loans (often overnight) to depository institutions, and it can serve as an emergency, back-up source of liquidity for borrowing depository institutions that lack other options." *Bloomberg, L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 601 F.3d 143, 145-46 n.1 (2d Cir. 2010) (internal quotation marks omitted).

to the SEC.[7]  *Id.*  The remaining withheld pages contain information collected and used by the Board and the FRBNY to assess the exposure of regulated financial institutions to Bear Stearns as well as communications between Board and FRBNY personnel.  *See* Thro Decl. ¶¶ 17-23 (describing withheld documents); Stefansson Decl. ¶¶ 12-14 (same).  On January 7, 2010 the SEC informed McKinley that it was withholding the eight documents referred to it by the Board pursuant to FOIA Exemptions 5 and 8.  Winter Decl. ¶ 5.

The Board moved for summary judgment on February 1, 2010 and McKinley filed a cross-motion for summary judgment. The Board produced a *Vaughn* index identifying the withheld material by document (rather than page), briefly describing the withheld material and listing the FOIA exemption pursuant to which the document was withheld.  *See Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).  McKinley does not challenge the Board's withholding of five documents pursuant to FOIA Exemption 6.  He challenges only the Board's reliance on FOIA Exemptions 4, 5 and 8.  The district court held that the withheld documents are protected from disclosure by FOIA Exemption 5 or, in the alternative, by Exemption 8 and granted summary judgment in favor of the Board.  *McKinley*, 744 F. Supp. 2d at 135-45.  The court did not address the applicability *vel non* of FOIA Exemption 4.[8]  *Id.* at 145.  McKinley timely filed a notice of appeal.

---

[7] McKinley does not discuss the SEC documents on appeal and has thus waived any challenge to the withholding of those documents. *See New York v. EPA*, 413 F.3d 3, 20 (D.C. Cir. 2005) (argument not raised in opening brief waived).

[8] McKinley's complaint originally included FOIA claims against the Federal Deposit Insurance Corporation but they were ultimately dismissed as moot.  *McKinley*, 744 F. Supp. 2d at 131 n.1 (internal citations omitted).

8

II.

We review the district court's grant of summary judgment de novo. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1111-12 (D.C. Cir. 2007). Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

FOIA requires federal agencies to disclose records upon request unless the records fall within one or more enumerated exemptions. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see* 5 U.S.C. § 552. The exemptions are narrowly construed so as not to " 'obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' " *Klamath*, 532 U.S. at 8 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). The relevant exemption is Exemption 5, which allows an agency to withhold disclosure of a record if the record meets two requirements: (1) it is an "inter-agency or intra-agency memorandum[] or letter[]" that (2) "would not be available by law to a party other than an agency in litigation with the agency."[9] 5 U.S.C. § 552(b)(5). McKinley argues the withheld material fails to satisfy both requirements.

A. Inter-Agency or Intra-Agency Memoranda

The Board concedes that the Federal Reserve Banks, including the FRBNY, are not federal agencies and therefore the withheld documents are not inter-agency memoranda. The

---

[9] Because we conclude that Exemption 5 shields from disclosure all of the withheld documents, we do not reach the applicability *vel non* of Exemption 8, which allows an agency to withhold disclosure of a record "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions." 5 U.S.C. § 552(b)(8).

Board further concedes that the Reserve Banks are not components of the Board, which concession would appear to disqualify the withheld documents from constituting intra-agency memoranda or letters. Under the "consultant corollary" to Exemption 5, however, we interpret "intra-agency" "to include agency records containing comments solicited from non-governmental parties." *Nat'l Inst. of Military Justice v. U.S. Dep't of Defense* (*NIMJ*), 512 F.3d 677, 680, 682 (D.C. Cir.), *cert. denied*, 129 S. Ct. 775 (2008). "When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *Id.* at 680 (quoting *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980)). Thus we held in *NIMJ* that the consultant corollary protected opinions and recommendations submitted by non-governmental lawyers to the United States Department of Defense regarding the establishment of military commissions to try suspected terrorists after the September 11, 2001 attacks. *Id.* at 678-79.

McKinley does not dispute the "consultant corollary" but challenges its application to the withheld documents on two grounds. First, in reliance on the holding in *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001), he argues the Board failed to demonstrate that the FRBNY's interest is identical to that of the Board. At issue in *Klamath* was a FOIA request submitted to the United States Department of the Interior's Bureau of Indian Affairs (Bureau) seeking disclosure of communications between the Bureau and certain Indian tribes—namely, six documents prepared by Indian tribes at the Bureau's request and one document prepared by the Bureau, all of which related to the allocation of water rights among competing users/uses. 532 U.S. at 6. The United States Supreme Court held that the requested documents were not protected from disclosure under Exemption 5. The Court noted

that in the "typical" case in which a court applies the consultant corollary, "the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* at 11. "[The consultant's] only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Id.* The Indian tribes, by contrast, "necessarily communicate with the Bureau with their own, albeit entirely legitimate, interests in mind." *Id.* at 12. Although that "fact alone distinguishes tribal communications from the consultants' examples recognized by several Courts of Appeals," the Court explained that the "distinction is even sharper, in that the [Indian] Tribes are self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* Lest there be any confusion, the Court restated the "dispositive point": "that the apparent object of the Tribe's communications is a decision by an agency of the Government to support a claim by the Tribe that is necessarily adverse to the interests of competitors." *Id.* at 14.

Unlike the Indian tribes, the FRBNY "[did] not represent an interest of its own, or the interest of any other client, when it advise[d] the [Board]" on the Bear Stearns loan. *Id.* at 11. As McKinley's counsel acknowledged at oral argument, the FRBNY is an "operating arm" of the Board. Oral Arg. 11:00-11:05. McKinley nonetheless claims that the FRBNY represented its own interest in its consultations with the Board regarding Bear Stearns because the FRBNY had an independent statutory duty to "obtain evidence that [Bear Stearns was] unable to secure adequate credit accommodations from other banking institutions" before making the loan. *See* 12 U.S.C. § 343(A). That the FRBNY had to obtain such evidence before it could approve the loan authorized by the Board does not mean its interest diverged from the Board's interest, however, and to claim otherwise, we believe, misconstrues the nature of the Federal Reserve System. The Board, together with the Federal

Open Market Committee—a body composed of the Board members and five presidents or first vice presidents of the Reserve Banks, 12 U.S.C. § 263—are statutorily mandated to "maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates," 12 U.S.C. § 225a. *See Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 277-78 (3d Cir. 2006) ("The individual Federal Reserve Banks serve as the foundation for the Federal Reserve System. . . .  The individual Federal Reserve Banks carry out the monetary policy . . . formulated [by the Federal Open Market Committee].  The Board . . . loosely oversees the Federal Reserve Banks' operations."), *cert. denied*, 549 U.S. 1115 (2007).  Board regulations make clear that "[t]he Federal Reserve System extends credit with due regard to the basic objectives of monetary policy and the maintenance of a sound and orderly financial system."  12 C.F.R. § 201.1(b).  As noted, the Board and Reserve Banks work together "to assist in achieving national economic goals through [the Reserve System's] influence on the availability and cost of bank reserves, bank credit, and money." *Reuss v. Balles*, 584 F.2d 461, 462 (D.C. Cir. 1978).  "The key to success of the [Reserve] System is harmonious interaction between and among [its] component parts." *Id.*  Statutes, regulations and case law make clear, therefore, that the Board and the Reserve Banks share a common goal, namely "the maintenance of a sound and orderly financial system."  12 C.F.R. § 201.1(b).  That the Congress requires both the Board and the relevant Reserve Bank (here, FRBNY) separately to determine that the loan made to Bear Stearns through JP Morgan promotes the maintenance of a sound and orderly financial system does not mean that the Board's and the FRBNY's interests diverged in deciding to make the loan.

McKinley also claims the Board failed to show it solicited the withheld material from the FRBNY as our precedent requires. *See, e.g.*, *NIMJ*, 512 F.3d at 680 ("[A]n agency record . . . submitted by outside consultants as part of the deliberative process[] and . . . *solicited by the agency* [is] an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." (emphasis added) (internal quotation marks omitted)); *id.* at 681, 683; *Ryan*, 617 F.2d at 790 (withheld records "were generated by an initiative from the Department of Justice, i.e., the questionnaire sent out by the Department to the Senators"). The Stefansson declaration, however, adequately demonstrates that the Board solicited the material from the FRBNY. When news of Bear Stearns's financial straits reached the Board, it began to focus on the effects of a Bear Stearns bankruptcy on the financial markets and particularly on LCBOs and other organizations supervised by the Board. Stefansson Decl. ¶ 8. The Board acted against a "backdrop" of significant turmoil and uncertainty in the financial markets. *Id.* ¶ 7.

> The deterioration of the U.S. housing market late in the summer of 2007 precipitated a sharp rise in uncertainty in financial markets about the value of structured or securitized assets. As demand for these products fell, funding pressures increased for a variety of financial institutions. As uncertainty grew over the magnitude of losses at financial institutions, these institutions became unwilling to lend to each other even against high-quality collateral, asset prices fell, and the availability of borrowing declined significantly. As a result, financial institutions faced severe liquidity pressures. These pressures accelerated rapidly between mid-January and mid-March 2008 . . . . If left unabated, this dynamic posed a risk of widespread insolvencies and severe and protracted damage to the financial system and, ultimately, to the economy as a whole.

*Id.* ¶ 6. The Board thus found itself reacting to what it believed to be an emergency, as evidenced by its decision "to provide temporary *emergency* financing to Bear Stearns." Thro Decl. Ex. A (minutes of Board 3/14/08 meeting) (emphasis added). "[A]s part of the Board's consideration of potential responses to Bear Stearns' [sic] funding difficulties" and "in accordance with well-established supervisory processes, Board and Reserve Bank staff responsible for LCBO supervision surveyed the LCBOs for purposes of assessing the LCBOs' real-time exposures to Bear Stearns." *McKinley*, 744 F. Supp. 2d at 136 (quoting Stefansson Decl. ¶ 8). The monitoring of LCBOs and advising the Board of their financial condition "is administered at the Federal Reserve Banks." Stefansson Decl. ¶ 2; *see also* 12 U.S.C. § 248(a)(1) (Board may "examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and . . . require such statements and reports as it may deem necessary"); *id.* § 325 (Federal Reserve member banks are "subject to examinations made by direction of the [Board] or of the Federal reserve bank by examiners selected or approved by the [Board]"); *id.* § 483 ("Every Federal reserve bank shall at all times furnish to the [Board] such information as may be demanded concerning the condition of any member bank within the district of the said Federal reserve bank."). Thus, to aid in its deliberative process, the Board sought information from the FRBNY about the financial condition and exposures of institutions monitored by the FRBNY. The FRBNY did not simply provide the information, unprompted, to the Board.

Accordingly, we conclude the withheld material constitutes "intra-agency memorandums or letters" under FOIA Exemption 5. We turn now to the second prong of Exemption 5.

## B. Deliberative Process Privilege

Intra-agency memoranda are exempt from disclosure under Exemption 5 only if they "would not be available by law to a party other than an agency in litigation with the agency." 5

U.S.C. § 552(b)(5). To satisfy the second requirement of Exemption 5, the record must be non-disclosable "under one of the established civil discovery privileges—here, under the 'deliberative process' privilege." *NIMJ*, 512 F.3d at 680 n.4 (citing *Klamath*, 532 U.S. at 8-9). "To qualify for Exemption 5 protection under the deliberative process privilege, 'an agency's materials must be both "predecisional" and a part of the "deliberative process." ' " *Id.* (quoting *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989)). McKinley acknowledges that the withheld material is predecisional but argues that the record is "deliberative" only if its disclosure would harm the agency's decisionmaking process. The Congress enacted FOIA Exemption 5, however, precisely because it determined that disclosure of material that is both predecisional and deliberative *does* harm an agency's decisionmaking process. As we have explained, Exemption 5

> was created to protect the deliberative process of the government, by ensuring that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity. In the course of its day-to-day activities, an agency often needs to rely on the opinions and recommendations of temporary consultants, as well as its own employees. Such consultations are an integral part of its deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions.

*Ryan*, 617 F.2d at 789-90; *see also Klamath*, 532 U.S. at 8-9 ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." (internal

quotation marks and citations omitted)); *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005) (deliberative process privilege " 'reflect[s] the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to "operate in a fishbowl" because the full and frank exchange of ideas on legal or policy matters would be impossible.' " (alteration in original) (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997))); *Formaldehyde*, 889 F.2d at 1125 (" '[H]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the *detriment of the decisionmaking process*.' " (ellipsis and emphasis in original) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975))); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (deliberative process privilege protects documents "which would inaccurately reflect or prematurely disclose the views of the agency"). Our role is not to second-guess that congressional judgment on a case-by-case basis. Attempting to do so, moreover, would prove impracticable:

> It would be impossible for courts to administer a rule of law to the effect that some but not all information about the decisional process may be disclosed without violating Exemption 5. Courts would become enmeshed in a continual process of estimating or, more accurately, guessing about the adverse effects on the decisional process of a great variety of combinations of pieces of information. That would inevitably lead courts on some occasions to undercut legitimate Exemption 5 protections. Indeed, such a procedure would not result in a rule at all. Agencies would have to pass on requests wholly impressionistically, subject to the impressionistic second-guessing of the courts.

That is hardly a satisfactory or efficient way of implementing FOIA.

*Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 775 (D.C. Cir. 1988) (en banc).

Moreover, the Board has demonstrated that disclosure of the withheld material would "discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Formaldehyde*, 889 F.2d at 1122 (internal quotation marks omitted). As part of the "bank supervisory process," "[s]upervised institutions frequently provide [Board and Reserve Bank examiners] with detailed, highly sensitive commercial information . . . that they do not customarily disclose to the public," disclosure of which "is likely to cause substantial competitive harm to the LCBOs." Stefansson Decl. ¶ 15. For example, an LCBO competitor could use the information "to assess sensitive trading relationships and credit relationships" and could "exploit the information . . . to weaken a specific entity and cause weaknesses in its liquidity position" by "pull[ing] or accelerat[ing] funding facilities the competitor had outstanding to the LCBO." *Id.* A competitor could also "use the data to underbid the LCBO in the private funding markets." *Id.* Information that revealed the LCBO faced a "funding shortage" could "cause some retail and commercial customers to move their business to other banks and may cause analysts to downgrade the LCBO's stock." *Id.* In short, information collected by the Board and Reserve Banks from supervised institutions could harm those institutions if disclosed to the public. For that reason, "[s]upervised institutions rely on bank supervisors to protect the confidentiality of information obtained through the supervisory process" and "are willing to provide this information because they know that the supervisors will maintain its confidentiality." *Id.* The Board and Reserve Banks "rely on the willingness of supervised institutions to provide full information in order to

assure a robust supervisory environment." *Id.* If supervised institutions no longer believe the Board could or would maintain the confidentiality of information it collects through the supervisory process, they would be less willing to provide the Board with the information it needs "to assure a robust supervisory environment." Disclosure of the type of information withheld here, therefore, "would impair the Board's ability to obtain necessary information in the future[] and could chill the free flow of information between the [supervised] institutions and the Board and Reserve Bank[s]." *Id.*; *see also* Winter Decl. ¶ 7 ("Release of this type of information would have an inhibitive effect upon the development of policy and administrative direction. In my opinion, SEC employees would hesitate to offer their candid opinions to superiors or coworkers, as well as colleagues in other federal agencies, if they knew that their opinions of the moment might be made a matter of public record at some future date.").

## C. Attorney Work Product Privilege

The Board also withheld one document under Exemption 5 pursuant to the attorney work product privilege. *See Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) ("FOIA Exemption 5 incorporates the work-product doctrine and protects against the disclosure of attorney work product."). "The work-product doctrine shields materials 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent).' " *Id.* (quoting Fed. R. Civ. P. 26(b)(3)). According to the Board, the withheld document "was prepared by FRBNY attorneys in anticipation of litigation by Bear Stearns shareholders related to the Board's authorization to extend credit to [Bear Stearns] indirectly through [JP Morgan]." *Vaughn* Index Doc. No. 38 (Joint Appendix 97). On appeal, McKinley argues only that the FRBNY does not come

within the consultant corollary and for that reason the Board cannot claim the attorney work product privilege. Having concluded that the FRBNY did indeed act as a consultant to the Board, we reject McKinley's argument. The FRBNY, acting as the Board's consultant, prepared the withheld document for the Board in anticipation of litigation. *Id.* Accordingly, the Board properly withheld the document under Exemption 5.[10]

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Board.

*So ordered.*

---

[10] In *Bloomberg L.P. v. Board of Governors of the Federal Reserve System*, 601 F.3d 143, 145-46, 147 (2d Cir. 2010), the Second Circuit recently held that records regarding loans made by the twelve Reserve Banks to certain private banks in April and May 2008—specifically "the name of the borrowing bank, the amount of the loan, the origination and maturity dates, and the collateral given"—cannot be withheld under FOIA Exemption 4. The Board argued before the district court that the withheld records were exempt from disclosure under Exemption 5 but declined to appeal the district court's adverse ruling on Exemption 5. *Id.* at 146. Thus, the Second Circuit did not address the applicability *vel non* of Exemption 5 to the requested records. *Id.* at 146-47. Although the district court held the requested records were not protected under Exemption 5, it did not address the issues relevant here. The court accepted—because Bloomberg did not dispute—the Board's assertion that the withheld records were inter-agency or intra-agency memorandums or letters. *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 280-81 (S.D.N.Y. 2009). Furthermore, the Board did not rely upon the deliberative process privilege. *Id.* at 281-82.